## Barr v. Gilmour.

(Decided September 30, 1924.)

### Appeal from Warren Circuit Court.

1. Compromise and Settlement—Agreement Need Not be in Writing.—If minds of contracting parties met upon compromise, it was enforceable, even though not in writing.

2. Accord and Satisfaction—Compromise and Settlement—Accord and Satisfaction Must be Executed, But Compromise Agreement Need Not.—An unexecuted accord and satisfaction does not offer bar to original cause of action, while valid compromise agreement, though executory, operates as such bar.

3. Compromise and Settlement—Not Essential that Both Parties have Legal Rights Upon Merits, if Bona Fide Dispute Exists.—Compromise may affect all rights or claims arising out of contract or tort, providing such claims are conflicting and that bona fide dispute exists between parties, and it is not essential that both parties have legal rights upon merits.

4. Compromise and Settlement—It is Essential that there be Actual Offer and Acceptance.—It is essential to compromise that there be actual offer of compromise and acceptance thereof.

5. Compromise and Settlement—Whether Parties Came to Final Conclusion Binding Upon them Held for Jury.—Whether parties reached final conclusion upon subject of compromise and their minds met so that they would be bound by the agreement, though not yet reduced to writing, held for jury.

6. Compromise and Settlement—Petition Against Dentist on Compromise Agreement Need Not Aver Defendant had been Guilty of Negligence.—Petition in action against dental surgeon on compromise agreement need not aver defendant had been guilty of negligence and unskillfulness in performance of surgical operation, where it alleges that there was a bona fide controversy between plaintiff and defendant concerning defendant's negligence and unskillfulness.

7. Compromise and Settlement—Valuable Consideration Unnecessary.—Mutual promise of parties was sufficient consideration for agreement to compromise claim against dentist for malpractice, and valuable consideration was not necessary, if there was bona fide controversy.

8. Husband and Wife—Husband could Enter Into Compromise Agreement with Dental Surgeon for His Wife Claiming Negligent and Unskillful Operation.—Where wife authorized him to do so, husband could enter into a compromise agreement with a dental surgeon for damages for alleged negligence and unskillfulness of dental surgeon in treating wife.

9. Witnesses—Husband, Acting as Agent for Wife in Transaction, Competent to Testify Thereto.—Husband, acting as agent for wife in entering into compromise agreement in her absence, was competent witness for her, under Civil Code of Practice, section 606.

10. Trial—Requested Instruction Held Substantially Covered by Given Instruction.—Requested instruction as to meeting of minds on compromise of claim for malpractice held sufficiently covered in substance by given instruction.

N. P. SIMS, SIMS & SIMS and THOMAS, THOMAS & LOGAN for appellant.

L. B. FINN for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE SAMPSON— Affirming.

Appellant Barr is a dental surgeon, practicing in Bowling Green, and appellee, Mrs. Gilmour, a resident of that city, is the wife of the chief telegraph operator at that place. Sometime in August, 1921, Mrs. Gilmour went to the office of Dr. Barr for the purpose of obtaining treatment for her gums, teeth and mouth. After making an examination Dr. Barr lanced her gums for abscess. A few days later he again lanced her gums. Soon thereafter she had lockjaw and suffered great agony. She attributed her tetanus to the unskillfulness and negligence of Dr. Barr and accused him of operating upon her with an unclean instrument or with dirty hands, and threatened to sue him. The husband of the plaintiff called upon Dr. Barr at his office and told him the situa-

tion, and demanded that he pay the expenses which the plaintiff had incurred in going to other dentists and surgeons for operations caused, as she insisted, by the negligence and want of skill of Dr. Barr, and when he refused to do so, this suit was commenced. Mrs. Gilmore averred in her petition and testifies upon the trial that she made her husband her agent for the settlement of her claim against Dr. Barr and that her husband had full authority to act for her. Dr. Barr asked her husband what expenses had been incurred on account of Mrs. Gilmour's lockjaw and he was told that the total was about $2,000.00. According to plaintiff's husband, Dr. Barr offered $500.00 in compromise, and that was rejected. He then offered $750.00 and said that was all the money he could raise at that time; that this sum belonged to his wife, being inherited from her father. The doctor was told, however, that this would not begin to pay the bill. It was then agreed, according to Dr. Barr and Mr. Gilmour, that the latter should return to his home and talk the matter over with his wife and see what was the least she would agree to take and later report to the doctor. Mr. Gilmour also says that neither he nor Dr. Barr was to engage a lawyer or consult anyone about it. A day or so thereafter he heard that Dr. Barr had gone to Franklin, Kentucky, to see a physician who had Mrs. Gilmour under treatment in his hospital. When Dr. Barr returned Mr. Gilmour called him up and told him the whole proposition was off because he had violated his agreement concerning consultation with other persons. It was not long thereafter until a friendly third person induced the parties to again take up negotiations looking to a compromise, and when they came together it was agreed, so the plaintiff insists, that Dr. Barr was to pay Mrs. Gilmour and her husband the sum of $900.00 in full settlement and satisfaction of their claim against him for damages on account of the unsatisfactory dental surgical operation. This agreement was reduced to writing, and reads:

"This contract of release made and entered into this January 28th, 1922, by and between N. M. Gilmour and his wife, Lucy Gilmour, parties of the first part, and E. Wallace Barr, party of the second part.

"WITNESSETH: That, whereas there has arisen between the parties hereto a controversy as to certain injuries resulting to Lucy Gilmour from dental operations, and whereas the parties hereto desire to

avoid any litigation concerning said injury, it is agreed between the parties to this contract that upon receipt of $900.00 this day cash in hand paid the first parties by the second party, the receipt whereof is hereby acknowledged, the first parties do hereby release E. Wallace Barr from any and all liability for any injury or damage which Lucy Gilmour has sustained by reason of said dental operations and from any and all liability for any damages which may result to the said Lucy Gilmour in the future on account of said dental operations. N. M. Gilmour, the husband of Lucy Gilmour, joins in this instrument to release E. Wallace Barr from any and all liability to the said N. M. Gilmour for any damage the said N. M. Gilmour may have sustained, or may in the future sustain by reason of said dental operations performed upon his wife, Lucy Gilmour.

"E. Wallace Barr enters into this contract without admitting any liability upon his part and without admitting that he has been guilty of any neglect or malpractice; and he has entered into this contract of settlement over the advice of his attorneys, Sims & Sims, and in the face of the advice of said attorneys, that he was in no wise liable to the first parties and that any suit they might bring could be successfully defended.

"In witness whereof the parties hereto have signed their names this the day and date first above written."

But the writing was never signed by any one of the parties save Mrs. Gilmour. It was prepared at the instance of Dr. Barr and by his attorney, Porter Sims, of Bowling Green. The parties met at Mr. Sims' office and told him their business. Thereupon he called his stenographer and dictated to her the writing and after some controversy as to whether the clause stating that "E. Wallace Barr enters into this contract without admitting any liability upon his part and without admitting that he has been guilty of any neglect or malpractice, etc.," should be placed in the writing, it was explained by the lawyer to Mr. Gilmour and was finally agreed upon for the benefit of Dr. Barr who, it was insisted, desired to ward off the bad effects of such a settlement by incorporating in the agreement or settlement the statement that he did not admit his liability or that he was guilty of malprac-

tice. After going over the matter with the parties Mr.
Sims made some corrections in the dictated agreement
and sent his stenographer to put it in type. Thereupon
both Dr. Barr and Mr. Gilmour left the office, it being
understood that the lawyer would carry the writing down
to Mr. Gilmour at the depot before six o'clock so that he
could carry it with him to Franklin that night and obtain
the signature of his wife, who was there in a hospital.
About six o'clock the attorney appeared at the office of
Gilmour in the depot and read to him the writing, and
they had some slight conversation, and it was delivered
to Gilmour with the understanding he was to take it to
Franklin and obtain the signautre of his wife and to bring
it back on Monday. In telling about how the compromise
came about Mr. Gilmour testified:

> "Well, anyway, on Friday, the following morn-
> ing Dr. Barr called me and asked me to come to his
> office, and when I got there he said that Dr. Guthrie
> had talked to him over the long distance phone 'And
> he said that you were willing to settle for $900.00,'
> and I said 'Yes, we will settle for $900.00,' and then
> Dr. Barr asked me if we had any objection to his
> getting some lawyer to draw up a release for future
> reference to show that there had been a settlement
> effected, and I said 'Yes, that is all right with us,'
> and he says, 'How about Porter Sims?' and I said
> 'All right,' and he followed me to the door and said,
> 'There will be no more of this, will there?' and I
> says 'No,' and on Friday night I went to Franklin
> and came back to Bowling Green Saturday morning
> on the nine o'clock train and went to work, and Dr.
> Barr called me on the 'phone and asked me to meet
> him at Porter Sims' office at two o'clock, and I went,
> and Dr. Barr introduced me to Mr. Sims and asked
> me to have a seat, and Mr. Sims says, 'Mr. Gilmour,
> Dr. Barr tells me that a little controversy has arose
> between you all about an operation and you all have
> agreed to compromise for $900.00, is this correct?'
> and I says 'Yes,' and he called his stenographer and
> dictated it to her, and I believe it started out this
> way, 'This contract of release made and entered into
> this January 28th, 1922, by and between N. M. Gil-
> mour and his wife Lucy Gilmour, parties of the first
> part, and E. Wallace Barr, party of the second part,'
> or words to that effect, and when he got down into
> the body of it, when he got to this part he says, 'Dr.

Barr says he is advised by his attorney that he can defend this suit,' and I says, 'Why does he do that if he doesn't admit his guilt?' and he says, 'He does admit his guilt, but he wants this so it won't ruin his future practice,' and I says, 'I don't want to do that,' and he says, 'You are a telegraph operator and suppose I would go down the streets and say you are a bum telegraph operator, how long do you suppose that would take to get over Bowling Green?' and I says, 'Twenty minutes,' and he says, 'That is exactly the reason I did this, to protect Dr. Barr,' and he asked his stenographer to draw it up, and I believe there was to be three copies, and he said it would take ten, fifteen or maybe twenty minutes to do that, and I couldn't wait, and he says, 'I will have this drawn up,' and asked me what time I left Bowling Green, and I told him on the six o'clock train, and I suppose somewhere between 6 and 6:30 he brought it to the station in the office and I stepped over to the cabinet and he took out the contract and said, 'I want to read you this contract,' and he took out a fountain pen or pencil as he read it to me very low, and says, 'This is identically the same contract that was dictated in yours and Dr. Barr's presence about two o'clock, take this and have Mrs. Gilmour sign it and bring it back Monday morning or as soon as you can, and I will have your $900.00,' and I carried it to Franklin, and she was too sick for me to mention it to her, and I didn't mention it until the next afternoon, Sunday afternoon, maybe between four and six o'clock, for I went down on a freight train that afternoon ahead of time, and she read the contract and signed it, and I was to take it next morning, and next morning our little baby was born and she was so low, for she had had nine operations, and I went back then in a day or two, and Mr. Sims asked me if I was ready for settlement and says, 'Has Mrs. Gilmour signed the contract?' and I told him she had, and he says, 'Let's have it,' and I handed him the contract and he tore it up, and I says, 'What does this mean?' and he says, 'It means we are not to pay you,' and I says, 'What have you to do with it; I thought you were engaged to settle it?' and I believe I said 'I have been crooked,' I don't know what I said, but I was mad, and I walked out of the office.''

Later on in his evidence Mr. Gilmour stated:

"Yes, sir, after we had agreed on the $900.00, he says, 'If you don't mind I will get some lawyer to put this in writing, not that the contract is closed, but I want something to show for the settlement.'

"Q. Was there anything else in the contract except that he was to pay you $900.00?

"A. There was nothing said to anyone about the payment of the money, and he asked me if I objected to a lawyer drawing up a release and I said, 'That is all right,' and he said, 'Do you consider the deal closed?' and I said 'I do,' and he said, 'I will call you and tell you when to meet me at Mr. Porter Sims' office.''

If the minds of the contracting parties met upon a compromise it was enforceable even though not in writing. There is a distinction which is usually made between a compromise and settlement and accord and satisfaction. An unexecuted accord and satisfaction does not offer a bar to an original cause of action, while a valid compromise agreement although executory operates as such bar. 12 C. J., p. 315. A compromise may effect all the rights or claims arising out of contract or tort, providing such claims are conflicting, and provided further that a *bona fide* dispute or controversy exists between the parties, but it is not essential that both parties have legal rights upon the merits. It is essential, however, that there be an actual offer of compromise and an acceptance thereof, and when such an offer is made and accepted by the party on the opposite side it becomes binding and enforceable although not reduced to writing. When made a compromise agreement is conclusive between the parties of all matters included unless impeached for fraud or mistake.

While appellant Barr insists that there was no meeting of the minds of the contracting parties, no final proposition and acceptance of compromise, he does admit that the parties attempted to make such a compromise and that the writing was prepared just as stated by Mr. Gilmour, with some minor differences. It is his contention, however, that the compromise was not complete until reduced to writing, and that inasmuch as the writing had to go to Mrs. Gilmour for her signature no compromise was in fact effected and that he and his counsel had the right to withdraw their proposition of compromise

at any time before signing it. If, as contended by Dr. Barr, the compromise agreement was not in effect, that is, the parties did not reach a final conclusion upon the subject and their minds did not meet upon a compromise, then neither party was bound and the proposition of compromise was of no effect. But if the parties agreed upon all the terms of the compromise as claimed by Mrs. Gilmour and these terms were reduced to writing, even though not signed, the compromise was concluded and neither party could withdraw therefrom. This was a matter properly submittable to the jury. Indeed, it was the only question of fact to go to the jury. If the parties agreed upon all the terms of the contract and closed the deal, so to speak, they were bound, but if they did not finally conclude the compromise and there remained something to be done thereafter in order to conclude it, then no compromise was made. This question was submitted to the jury and it answered by its verdict that the compromise agreement was concluded by the parties at the time the writing was drawn up and there remained nothing to be done thereafter to make it effective.

The writing was not the compromise but only evidence of it. The compromise was effected when the minds of the parties met, one proposing and the other accepting. The writing was intended only to evidence their agreement and to save further controversy by enabling Dr. Barr to produce a writing showing the compromise had been effected; but the writing was not the compromise, merely evidence of it.

Appellant also insists that the general demurrer should have been sustained to the petition, because that pleading did not aver in terms that appellant had been guilty of negligence and unskillfulness in the performance of a surgical operation upon appellee, but only averred that appellee and her husband had charged appellant with failure to exercise reasonable care in the performance of the operation. As stated above, there must exist a good faith controversy, but the merits of the controversy need not be real and substantial, provided well informed minds might differ as to the rights of the parties. It is averred in the petition with sufficient exactness that appellee and her husband were asserting a claim against appellant Barr on account of his failure to properly perform the surgical operation upon the gums of Mrs. Gilmour and that he denied his liability upon this charge, thus making a controversy about which well in-

formed minds might differ. The good faith of the charge is also sufficiently averred in the petition. We think, therefore, the demurrer was properly overruled. However this may be, the answer of the appellant admits. there was a good faith controversy between the parties concerning his liability for damage for failure to exercise reasonable skill and diligence in the performance of the surgical operation upon Mrs. Gilmour, for it is alleged in the answer that "the plaintiff and her said husband charge this defendant (Dr. Barr) with having been unskillful or negligent or unprofessional in and about the operation on the plaintiff's gums."

He also insists that the judgment should be reversed because the trial court declined to allow him to file an amended answer after the jury had been sworn and part of the evidence introduced. This amended answer avers that "if he (Dr. Barr) made the compromise alleged in the petition of the plaintiff to pay her the sum of $900.00, or any other sum, as alleged in the petition, the said promise was without consideration to support it." The mutual promise of the parties was a sufficient consideration, and it has been often held that a valuable consideration is not necessary. If Mrs. Gilmour in good faith believed that Dr. Barr was responsible for her illness by reason of his unskillfulness in performing the operation on her and for that reason claimed damages from him, and he denied her right, thus constituting a good faith controversy which was the subject of compromise, and the parties entered into an agreement whereby he undertook to pay her $900.00 and she to cease to assert claim against him on account of such damages, the compromise was effected and enforceable. The want of consideration, therefore, did not and could not have entered into the merits of the present controversy.

He next insists that the trial court erred to his prejudice in allowing the husband of Mrs. Gilmour to testify for her after she had testified in part to the same facts. The record shows that Mrs. Gilmour, who had undergone several different operations and had given birth to a child, was confined in the hospital all the time negotiations were going on looking to a compromise and was not, therefore, able to be present at any of them. She testified, as did her husband, that she authorized him to act for her in the compromise and gave him full authority to enter into any agreement or compromise which he thought best for her. He, therefore, could conclude the

negotiations. What he did and said in his effort to compromise his wife's claim against Dr. Barr was not known to his wife except as she heard it from him, and she could not have testified to what her husband told her, as that would have been merely hearsay. But he was, under an amendment to section 606 of the Civil Code, a competent witness for her because he was her agent and testified to matters of which she had no direct knowledge. The court took this view and allowed him to testify. This was not error.

His last insistence is that the court refused to give to the jury an instruction offered by appellant as to the necessary elements of a complete and final settlement and a meeting of the minds of the parties. Instruction offered by appellant reads:

"The court instructs the jury that unless they believe from the evidence that unless all of the terms of the proposed contract of settlement were all agreed to by plaintiff and her husband, Nat Gilmour, and the defendant, E. W. Barr, and that the minds of all three parties met finally upon every term and proposition contained in said contract, they will find for the defendant."

The court gave one in substance the same, which reads:

"The court instructs the jury that if they believe from the evidence that at the time of the alleged settlement between plaintiff and defendant, defendant did not agree to pay plaintiff said $900.00 and that plaintiff did not by herself or agent agree to accept same as a settlement for the alleged injury, they will find for the defendant."

We think the court properly submitted the controversy to the jury. There was no error in the instructions prejudicial to the substantial rights of appellant.

Judgment affirmed.