MOTORISTS MUTUAL INSURANCE
COMPANY, Appellant,

v.

Jeffrey GLASS; Garnett Doyle Glass;
Brenda Glass; Gregg Y. Neal, Attor-
ney; and Kentucky Farm Bureau Mu-
tual Insurance Company, Appellees.

Kentucky Farm Bureau Mutual
Insurance Company,
Appellant,

v.

Jeffrey Glass; and Motorists Mutual
Insurance Company, Appellees.

Jeffrey Glass; Garnett Doyle Glass;
Brenda Glass; and Gregg Y.
Neal, Cross–Appellants,

v.

Motorists Mutual Insurance Company;
and Kentucky Farm Bureau Mutual
Insurance Company, Cross–appellees.

Nos. 95–SC–972–DG, 95–SC–980–
DG and 96–SC–800–DG.

Supreme Court of Kentucky

Oct. 30, 1997.

As Modified on Grant of Rehearing
Feb. 18, 1999.

Rehearing Denied Aug. 26, 1999.

Perry Adanick, Louisville, for Motorists Mutual Insurance Company.

Gregg Neal, Neal & Davis, Shelbyville, for Jeffrey Glass, Garnett Doyle Glass, Brenda Glass and Gregg Y. Neal.

Wayne J. Carroll, Edward H. Bartenstein, MacKenzie & Peden, PSC, Louis-

ville, for Kentucky Farm Bureau Mutual Insurance Company.

COOPER, Justice.

On May 13, 1988, Jeffrey Glass was injured while riding as a passenger in a vehicle owned by him and driven with his permission by Stephen Shelburne. Jeffrey was insured by Motorists Mutual Insurance Company (Motorists Mutual) and Shelburne was insured by Kentucky Farm Bureau Mutual Insurance Company (Farm Bureau). Following a trial by jury on Jeffrey's claim of bad faith against both insurers and his claim against Motorists Mutual for underinsured motorists coverage payments, the jury returned verdicts against Motorists Mutual in the total sum of $694,208.11 and against Farm Bureau in the total sum of $443,208.12. The trial judge subsequently awarded Jeffrey attorney fees against Motorists Mutual in the sum of $231,402.70 (one-third of $694,-208.11).

On July 19, 1993, judgment was entered in favor of Jeffrey Glass against Motorists Mutual in the total sum of $925,610.81 and against Farm Bureau in the total sum of $443,208.12. The judgment also awarded interest from July 9, 1993, the date of the verdict. On appeal, the Court of Appeals reduced the underinsured motorists' portion of the judgment against Motorists Mutual from $200,000.00 to $150,000.00 and ordered the interest to run from the date of judgment instead of the date of verdict. In all other respects, the judgment was affirmed. We granted discretionary review and now reverse.

Jeffrey's claim that the insurers were guilty of bad faith in failing to effect a prompt and fair settlement of his claim necessitates a detailed recitation of what occurred in this case.

## I. THE ACCIDENT AND INJURIES.

On May 13, 1988, Jeffrey Glass was nineteen years of age and resided with his parents, Doyle and Brenda Glass, in Waddy, Kentucky. He was employed as a parts salesman at Pierce Motor Company. That evening, he drove his 1980 Ford pickup truck to Stephen Shelburne's home in Shelbyville. On the way, he stopped at a liquor store and purchased some beer, which he iced down in a cooler in the back of the truck. He picked up Shelburne and the two proceeded to Bagdad, where they met Jeffrey's girlfriend, Kim Embert (now Hardin), and her friend, Heather Wentworth. The four left Bagdad at about 6:30 p.m. and drove to Georgetown where more alcohol was purchased. Kim Hardin testified that Jeffrey and Shelburne purchased some wine coolers for the girls and two more cases of beer, which they iced down in the cooler. The four then proceeded to a fairgrounds in Scott County where they attended a truck pull contest for several hours. Jeffrey admitted that he drank beer while driving from Shelbyville to Bagdad and that both he and Shelburne drank beer while driving from Bagdad to Georgetown. Kim Hardin testified that all four occupants of the pickup truck consumed alcohol during the trip from Georgetown to the fairgrounds, and continued to do so until they left the fairgrounds at approximately 9:30 p.m. As he drove the pickup truck out of the fairgrounds, Jeffrey almost rear-ended another vehicle and the girls "didn't think that I should be driving." He agreed to permit Shelburne to drive the vehicle.

Shortly thereafter, Shelburne made a wrong turn onto a narrow road and proceeded down a hill with a curve at the bottom of the grade. The vehicle apparently was going too fast for conditions. When Shelburne applied the brakes, the vehicle slid into a guard rail and turned up on its right side. Jeffrey was seated next to the passenger side door. When the vehicle rolled over, the weight of the other three passengers pressed against him and his right arm broke through the window and was severed when it was caught between the truck and the guardrail. Captain Willie Scott of the Scott County Police Department investigated the accident and interviewed Shelburne. Although he noted on his accident report that alcohol in-

volvement was a cause of the accident, Scott did not arrest Shelburne, because he did not believe Shelburne was intoxicated. Shelburne told Scott he had consumed "only two beers."

Jeffrey's arm was surgically reattached by Louisville Hand Surgery specialists at Jewish Hospital in Louisville. However, despite several surgeries, he has never regained full function of his right arm and has little or no use of his right hand. He was unable to return to his previous employment and testified that he could perform only light work on his grandmother's farm. As of the date of trial, Jeffrey had incurred $82,168.75 in medical expenses as a result of this accident, of which $36,564.40 had been incurred with Jewish Hospital and $30,647.50 had been incurred with Louisville Hand Surgery.

## II. THE INSURANCE POLICIES.

Jeffrey's 1980 Ford pickup truck was insured by Motorists Mutual policy number 5342–04–224866–11D. The trial judge concluded that the same policy also covered a 1978 Ford pickup truck. However, the policy declaration pages introduced into evidence in this case reveal that a previous vehicle was deleted from the policy on January 15, 1988, and that the 1978 Ford pickup truck was added to the policy on June 7, 1988; thus, as found by the Court of Appeals, the policy only covered one vehicle at the time of this accident. The policy provided liability coverage of $50,000.00 per person and $100,000.00 per accident for bodily injury and $50,000.00 per accident for property damage; uninsured motorists (UM) coverage of $50,000.00/$100,000.00; and underinsured motorists (UIM) coverage of $50,000.00/$100,000.00. The policy also provided basic personal injury protection (PIP) coverage of $10,000.00. Doyle and Brenda Glass were also named insureds on this policy, and bodily injury liability coverage was extended to Shelburne as an additional insured under the policy's omnibus clause.[1] Property damage liability coverage was excluded for this accident, both because the damaged vehicle was owned by the named insured,[2] Jeffrey Glass, and because it was damaged while "used by" or "in the care of" an additional insured,[3] Shelburne. These exclusions reflect the logic that damage to a vehicle owned or operated by a named insured or an additional insured is more appropriately the subject of collision (first-party) coverage than of liability (third-party) coverage. Jeffrey had not opted to purchase collision coverage for his vehicle.

The policy extended UIM coverage to the named insured and any family member living in the household.[4] An "underinsured motor vehicle" was defined as a land motor vehicle covered by a policy of insurance with liability limits less than the liability limits of the Motorists Mutual policy.[5] However, the policy excluded from this definition any vehicle owned by or furnished or available for the regular use of the insured or any family member.[6] The policy further provided that any amounts payable under UIM coverage shall be reduced by all sums paid for bodily injury damages by or on behalf of any person legally responsible, including "all sums paid under Part A."[7] Part A is the liability coverage portion of the policy containing the omnibus clause under which Shelburne was an additional insured for purposes of this accident.

Doyle and Brenda Glass were also the named insureds on Motorists Mutual poli-

1. Part A, Insuring Agreement, paragraph B2.

2. Part A, Exclusions, paragraph A2.

3. Part A, Exclusions, paragraphs A3 b and c.

4. Part C, Insuring Agreement, paragraph B1; Definitions, paragraph F.

5. Policy Provision Amendments to Part C, paragraph 1 (quoted verbatim at footnote 17, *infra* ).

6. Part C, Insuring Agreement, paragraph C, exception 1.

7. Part C, Limit of Liability, paragraph B1 (quoted verbatim at footnote 18, *infra* ).

cy number 5342–06–224865–00A, which insured two vehicles, a 1983 Pontiac Grand Prix and a 1979 Ford pickup truck. This policy contained liability coverage with limits of $100,000.00/$300,000.00 for bodily injury and $50,000.00 for property damage; UM coverage of $50,000.00/$100,000.00; and UIM coverage of $50,000.00/$100,000.00. The policy also contained basic PIP coverage, which did not apply to Jeffrey's injuries, since he was not a named insured of the policy and was not occupying the insured vehicle at the time of the accident. This second policy contained identical insuring agreements, exclusions and exceptions as policy number 5342–04–224866–11D. As a family member living in the household of the named insureds, Jeffrey was an insured for purposes of the policy's UIM coverage.

Shelburne was the named insured of an insurance policy issued by Farm Bureau. Although a specimen of this policy is not found in the record, a copy of the declarations page was filed in response to a discovery request. Examination of this document reveals that the policy provided liability coverage with limits of $100,000.00/$300,000.00 for bodily injury and $100,000.00 for property damage. Thus, Shelburne had available $150,000.00 in bodily injury liability coverage for this accident, $100,000.00 as the named insured under his own Farm Bureau policy and $50,000.00 as an additional insured under the Motorists Mutual policy covering Jeffrey Glass's 1980 Ford pickup truck. As the insurer of the motor vehicle involved in the accident, Motorists Mutual was the "primary" insurer for this accident, whereas Farm Bureau was the "excess" insurer. 46 C.J.S. *Insurance* § 1138.

Through her employment, Brenda Glass had a health insurance policy with Humana Health Plans, Inc., which paid $47,972.93 of Jeffrey's medical expenses. Humana retained a subrogation claim in that amount and eventually intervened in this action to collect that claim.

## III. THE NEGOTIATIONS.

The Glasses immediately reported this accident to their local agent, who in turn reported it to the claims department of Motorists Mutual's home office. Based on the local agent's description of the injuries, the home office established a reserve account of $50,000.00, the policy limits. The claim was assigned to claims representative Ted Gillahan, who obtained a copy of the police report, recorded statements from both Jeffrey Glass and Shelburne, and photographs of Jeffrey's damaged pickup truck. Gillahan discussed the provisions of Motorists Mutual's policy with Doyle Glass and told him that the policy provided $50,000.00 liability coverage.[8] Doyle's primary concern was that the medical providers, particularly the hospital, would end up with all the money. According to Gillahan, Doyle wanted Jeffrey to receive some cash up front and the balance protected from the medical providers.

Gillahan continued to document his file with medical and hospital records. He authorized payment of the PIP policy limits of $10,000.00 to Jewish Hospital. He received information from the doctor who had performed the surgery that Jeffrey could possibly regain 60% to 70% of the function of his right arm. On July 26, 1988, Gillahan spoke with Doyle Glass and suggested the possibility of a "structured settlement," whereby the insurance money would be used to purchase a tax-free annuity which eventually would pay Jeffrey more than the $50,000.00 policy limits and would spread the payments over a number of years. A note in Gillahan's file indicates that the Glasses were unsure of what they wanted to do.

On July 28, 1988, Motorists Mutual's home office authorized Gillahan to pay up to the $50,000.00 policy limits to settle the

---

8. Doyle Glass did not recall this conversation and professed not to have known at that time the liability limits of Motorists' policy. Of course, he was a named insured on the policy and could have ascertained the policy limits by looking at the declarations page.

case. According to Doyle Glass, Gillahan first offered $25,000.00, which was refused. Gillahan then contacted William Hackney of Ringler Associates, Inc., a structured settlement specialist, and requested that he prepare several proposed structured settlements costing in the range of $40,-000.00 to $42,000.00. Gillahan testified that his plan was to offer a structured settlement in that range with the balance of the policy limits to be paid in cash.

■ Shelburne did not report this accident to Farm Bureau until August 17, 1988. Joel Depp, a Farm Bureau senior claims representative, then obtained a copy of the police report, which indicated alcohol involvement as a cause of the accident. He took recorded statements from Jeffrey Glass and Shelburne, both of whom admitted that they had been drinking prior to the accident. Depp also obtained information that Jeffrey's right arm had been severed and surgically reattached with a "good result." At this point, the medical bills were in the neighborhood of $20,-000.00. Depp testified that based on this information, he placed a settlement valuation on the claim at $150,000.00 to $200,-000.00 with a 50% discount for comparative negligence because of the alcohol involvement,[9] for a total evaluation of $75,000.00 to $100,000.00. He admitted that his file did not contain a written notation of this evaluation. Farm Bureau was the excess insurer and, at this point, Motorists Mutual had neither paid its policy limits nor demanded any contribution toward a possible settlement. Thus, Depp took no further action until October 6, 1988, when a supervisor suggested that he contact Motorists Mutual to determine the status of the claim.

Meanwhile, Gillahan, who was not a structured settlement specialist, had authorized Hackney to negotiate with the Glasses on behalf of Motorists Mutual. Depp's request for a status update was forwarded to Hackney. On October 19, 1988, Hackney met with the Glasses and advised them that Farm Bureau might be induced to contribute to a possible settlement. By this time, Humana had put the Glasses on notice of its subrogation rights against any settlement Jeffrey might receive. Throughout their negotiations with Gillahan and Hackney, the Glasses expressed reluctance to accept any settlement offer absent a guarantee that the settlement would be protected from Humana's subrogation claim. Gillahan testified that this was one reason why he proposed a structured settlement rather than a lump sum payment. Hackney suggested that the settlement agreement might be drafted to reflect that the settlement was only for pain and suffering and impairment of earning capacity, which might protect it from Humana's subrogation claim for medical payments.[10] However, he would not guarantee that the settlement would be insulated from Humana's claim.

On October 31, 1988, Hackney asked Gillahan for authorization to spend the entire $50,000.00 to purchase an annuity to be offered as a structured settlement. (Hackney is paid by the annuity insurer, not the liability insurer.) Gillahan authorized Hackney to apply $46,000.00 toward the purchase of the annuity.

---

**9.** A passenger injured while riding in a vehicle operated by an intoxicated driver can be charged with contributory fault. *Isaac v. Allen*, Ky., 429 S.W.2d 37 (1968); *Whitney v. Penick*, 281 Ky. 474, 136 S.W.2d 570 (1940). Any judgment in favor of the plaintiff passenger is reduced by the amount of the judgment which correlates with his percentage of contributory fault. *Hilen v. Hays*, Ky., 673 S.W.2d 713 (1984).

**10.** Ironically, the Glasses asserted at oral argument that this offer to "beat" Humana out of its subrogation claim constituted additional evidence of Motorists Mutual's overall bad faith in handling the Glasses' claim. Eventually, the Glasses were able to negotiate a settlement with Humana for $12,500.00, approximately $35,000.00 less than its claim, which is also ironic in view of the Glasses' continued claim that it was "bad faith" for the insurance companies to attempt to negotiate a settlement with them for a sum less than their policy limits.

On November 10, 1988, Hackney contacted Depp about a possible contribution toward settlement. Depp requested a written proposal and also requested updated documents, including medical bills, medical reports, etc. Depp then personally contacted Doyle Glass, who advised that there were still $5,000.00 to $6,000.00 in medical bills which had not been paid by Humana. On November 18, 1988, Hackney advised Depp that Motorists Mutual would send Depp the requested documents. On December 15, 1988, it was learned that Motorists Mutual had mistakenly forwarded the documents to Doyle Glass instead of to Depp. Depp contacted Doyle Glass and made arrangements for the documents to be sent to Farm Bureau. The documents finally arrived on December 19, 1988.

On December 21, 1988, Depp informed Hackney that before Farm Bureau could contribute to the settlement, he needed written proof that Motorists Mutual intended to pay its policy limits. On the same day, Motorists Mutual sent Farm Bureau written confirmation of that intent. Also on the same day, Motorists Mutual issued payment drafts for $49,500.00 to United Pacific Life Insurance Company to purchase an annuity which would pay Jeffrey Glass $485,000.00 over a period of forty years, and $500.00 to Reliance Insurance Company for a bond premium to guarantee the annuity payments. Upon receipt of those documents, Depp gave Hackney authority to use up to $35,000.00 of Farm Bureau's money to settle the claim.

On December 22, 1988, Hackney advised Depp that the Glasses had rejected the $35,000.00 offer and requested $50,000.00 authority to attempt a settlement. On December 30, 1988, Depp gave Hackney the requested authority. Hackney then offered the Glasses the United Pacific annuity plus Farm Bureau's $50,000.00.[11] The Glasses did not respond to this offer until

May 1989. Hackney testified that Doyle Glass told him he needed to confirm that the settlement was tax free. Doyle testified that he met with an attorney in Lexington and confirmed that Humana had a valid subrogation claim under its health insurance policy. On May 17, 1989, Hackney requested an additional $25,000.00 authority from Farm Bureau to settle the claim, but advised Depp that he did not believe he would need to use the full $75,000.00 to obtain a settlement. On May 25, 1989, Depp gave Hackney the requested additional authority.

On May 31, 1989, Hackney notified Depp that on May 27, 1989, he had settled with the Glasses for Motorists Mutual's policy limits, represented by the United Pacific annuity, and $64,373.00 to be paid by Farm Bureau. Of this sum, $53,873.00 would be paid to Safeco Insurance Company for an annuity which would pay Jeffrey Glass a total of $424,200.00, payable in monthly installments over the duration of his life; $500.00 would be paid to Safeco Assigned Benefits Company for the bond premium; and the final $10,000.00 would be paid in cash, $2,500.00 directly to Jeffrey and $7,500.00 directly to Doyle and Brenda to reimburse them for medical bills not covered by insurance. Farm Bureau issued payment drafts for the annuity, the bond, and the lump sum payments, all of which were forwarded to Hackney. Hackney purchased the annuity and the bond and prepared the necessary settlement agreement and releases to memorialize the settlement. It was Hackney's intention that on June 23, 1989, he would personally deliver the annuities, the checks and the documents to the Glasses and obtain their signatures on the settlement agreement and releases.

When Hackney called Doyle Glass to confirm the June 23, 1989 appointment, he was told that the Glasses were discussing the annuities with a tax advisor. Approxi-

11. It is unclear whether Farm Bureau's $50,000.00 was to be in cash or in the form of an annuity.

mately two months later, Doyle advised Hackney that he was seeking the advice of an attorney. On September 7, 1989, the Glasses' present attorney advised Hackney that he was representing the Glasses and that the offer of a structured settlement had been rejected. Hackney notified Gillahan and Depp of this fact and requested advice on what to do with the payment drafts and the annuities. He was told to hold them until further notice.

■ On September 14, 1989, the Glasses' attorney wrote a letter to Motorists Mutual demanding that the liability coverages for the four vehicles covered under both policies [12] be stacked [13] for a total of $300,000.00, and that the UIM coverages for all four vehicles be stacked for an additional $200,000.00, for a total settlement demand of $500,000.00. On the same day, the Glasses' attorney wrote a letter to Depp demanding that Farm Bureau pay its bodily injury liability policy limits of $100,000.00, and that it also pay Humana's subrogation claim. These were the first demands received by either Motorists Mutual or Farm Bureau to settle this case. Both demands exceeded the limits of their respective policies. Motorists Mutual responded that its liability limits were $50,000.00 and that it did not owe any payment under its UIM coverage. Farm Bureau responded that it was relying on the settlement reached on May 27, 1989. Both Motorists Mutual and Farm Bureau reiterated their willingness to effectuate the terms of the May 27, 1989 agreement.

## IV. THE PRE–TRIAL LITIGATION.

■ The complaint in this action was filed on May 3, 1990. It set forth a negligence claim against Shelburne, a UIM claim against Motorists Mutual, bad faith claims and alleged violations of the Unfair Claims Settlement Practices Act (UCSPA), KRS 304.12–230, against both insurers, and a claimed violation of the Consumer Protection Act, KRS 367.220, against Motorists Mutual. The defendants all pled the May 27, 1989 settlement as a bar to the action. In pre-trial depositions, all three Glasses testified that no settlement agreement had been reached on May 27, 1989. Hackney testified that an agreement had been reached and that the parties had shaken hands on the deal. He introduced the annuities, the settlement documents, and the checks, which had been prepared pursuant to the agreement. The Glasses moved for a partial summary judgment on this issue.

■ It has long been the law of this Commonwealth that the fact that a compromise agreement is verbal and not yet reduced to writing does not make it any less binding. Furthermore, if a dispute exists as to whether an oral agreement was reached, the issue is to be resolved by a jury. *Barr v. Gilmour*, 204 Ky. 582, 265 S.W. 6 (1924). Thus, not only was the defense of compromise and settlement fairly debatable, Hackney's testimony alone was sufficient to create a jury issue. *Steelvest, Inc. v. Scansteel Service Center, Inc.*, Ky., 807 S.W.2d 476, 482 (1991). Nevertheless, on October 8, 1992, a partial summary judgment was entered in favor of the Glasses to the effect that no settlement agreement had been reached on May 27, 1989.

Shortly thereafter, Farm Bureau offered to settle the case by paying the Safeco annuity package, plus $35,627.00 in cash, representing the balance of its $100,000.00 policy limits. At the request of the Glasses' attorney, this offer was reduced to writing. Although the response to this offer is not in the record, a subsequent letter to the Glasses' attorney from Farm Bureau's attorney indicates that the response was another demand for a sum in excess of Farm Bureau's liability limits. In his letter, Farm Bureau's attorney reit-

12. As explained *supra,* there was only one vehicle covered under policy number 5342–04–224866–11D.

13. Liability coverages cannot be stacked. *Butler v. Robinette*, Ky., 614 S.W.2d 944, 947 (1981); *Windham v. Cunningham*, Ky.App., 902 S.W.2d 838 (1995).

erated his client's willingness to pay its policy limits and offered to pay either the annuity plus the cash balance or, in the alternative, to pay a lump sum of $100,-000.00 in cash.

On April 29, 1993, the Glasses settled Humana's subrogation claim for $12,-500.00. On May 5, 1993, they settled their liability claim against Shelburne for $150,-000.00, representing Motorists Mutual's policy limits of $50,000.00 and Farm Bureau's policy limits of $100,000.00. Both payments were made in cash without any structured settlement. The case then proceeded to trial on the remaining issues raised in the complaint.

## V. THE TRIAL.

█ At trial, Jeffrey Glass, Kim Hardin, Heather Wentworth, and the investigating officer, Willie Scott, testified about the facts of the accident. Although Shelburne was called as a witness by the Glasses' attorney, he testified only briefly and not about the accident. Scott was permitted to testify that in his opinion, Shelburne was not intoxicated at the time of the accident. However, Hardin and Wentworth were not permitted to express their opinions that all four occupants of the pickup truck were intoxicated.[14] Jeffrey's treating physician testified to the nature and extent of his injuries and a vocational economic analyst testified to the monetary loss resulting from the permanent impairment of Jeffrey's power to labor and earn money.

Jeffrey, Brenda and Doyle Glass all testified to their versions of their negotiations with Gillahan and Hackney. Doyle and Brenda Glass testified that they suffered mental anguish about their possible financial problems as a result of Jeffrey's injuries, particularly with respect to Humana's subrogation claim. Jeffrey did not testify to any mental anguish caused by the settlement negotiations. Gillahan and Hackney testified to their versions of these negotiations, and Depp and three other Farm Bureau employees testified to their handling of this claim.

Clinton Miller, an insurance consultant from San Jose, California, testified on behalf of the Glasses that both Motorists Mutual and Farm Bureau had acted in bad faith by not immediately offering to pay their policy limits, including Motorists Mutual's liability coverage for property damage and its UIM coverage, even though neither coverage applied to this accident.[15] Miller was permitted to testify to his interpretation of the UIM statute, even though his interpretation was contrary to the interpretation given to it by this Court in *LaFrange v. United Services Automobile Association,* Ky., 700 S.W.2d 411 (1985). He testified that Farm Bureau acted in bad faith by not paying Jeffrey Glass's $1,975.00 property damage claim under its liability coverage, even though payment of this claim was never included in the settlement demands made either before or after the commencement of this litigation or, apparently, at the time the liability claim against Shelburne was finally settled.[16] Miller was permitted to express his opinion that the value of Jeffrey Glass's claim was between $900,000.00 and $1,250,000.00, although he admitted that he had no knowledge concerning jury verdicts in the community where this case was tried, but

14. In Kentucky, a lay witness may testify on the basis of observation and appearance that another person was intoxicated at a given point in time. *Johnson v. Vaughn,* Ky., 370 S.W.2d 591, 593 (1963); *Howard v. Kentucky Alcoholic Beverage Control Board,* 294 Ky. 429, 172 S.W.2d 46 (1943); R. Lawson, *The Kentucky Evidence Law Handbook,* § 6.10, p. 281 (3rd ed. Michie 1993).

15. See text at footnotes 2 and 6, *supra,* and footnote 18, *infra.*

16. Since a specimen of the Farm Bureau policy is not found in this record, its provisions are unknown; but if it contained the same standard exclusion for property damage liability for damage to property "used by" or "in the care of" the insured, as was contained in Motorists Mutual's policies (see footnote 3, *supra* ), there would be no property damage liability coverage applicable to this accident and that would explain why no demand was ever made that Farm Bureau pay that aspect of Jeffrey's claim.

rather had used a computer program based on jury verdicts from all over the United States. This was in direct contravention of our holding in *Manchester Insurance & Indemnity Co. v. Grundy,* Ky., 531 S.W.2d 493 (1975), *cert. denied,* 429 U.S. 821, 97 S.Ct. 70, 50 L.Ed.2d 82 (1976).

We note that in the trial of this case the two expert witnesses introduced by Grundy testified as to what amount they would consider the case worth for settlement purposes. This is irrelevant. The test of this factor is what in the opinion of the expert *a jury in the same community* probably would have awarded at the time of the trial on liability.

*Id.* at 501. (Emphasis added.)

Compounding the prejudicial effect of this testimony, defense counsel was not allowed to impeach Miller by showing that Miller, himself, had filed nine lawsuits against various insurance companies claiming millions of dollars for bad faith and unfair claims settlement practices because of the failure of the insurance companies to promptly pay relatively minor property damage claims asserted by him. On avowal, he admitted that each case was settled by the insurer's payment of the underlying claim and without payment of any compensatory or punitive damages for his bad faith and UCSPA claims. This evidence was relevant to impeach Miller's credibility by showing his personal bias against insurance companies and in favor of using bad faith and UCSPA allegations to extort payment of underlying claims from insurers. "Any proof that tends to expose a motivation to slant testimony one way or another satisfies the requirement of relevancy. The range of possibilities is unlimited...." R. Lawson, *The Kentucky Evidence Law Handbook,* § 4.15, p. 183 (3rd ed. Michie 1993).

The interest of a witness, either friendly or unfriendly, in the prosecution or in a party is not collateral and may always be proved to enable the jury to estimate credibility. It may be proved by the witness' own testimony upon cross-examination or by independent evidence.

*Parsley v. Commonwealth,* Ky., 306 S.W.2d 284, 285 (1957). See also *United States v. Spencer,* 25 F.3d 1105 (D.C.Cir. 1994), in which the prosecutor in a criminal case was permitted to show for impeachment purposes that a defense witness had pending charges against her in conjunction with long-standing harassment of the police.

The defendants presented the testimonies of John Berry, an attorney from an adjoining county, and James E. Martain, a retired insurance supervisor from Louisville, who expressed their opinions that the insurers had not acted in bad faith in their dealings with the Glasses.

At the conclusion of the evidence, the trial judge dismissed the claims of Brenda and Doyle Glass. Neither parent was injured in this accident. Jeffrey Glass was an adult; so any expenses his parents incurred on his behalf were not reimbursable directly from either Motorists Mutual or Farm Bureau, but were owed to them by Jeffrey. A parent does not have a personal cause of action for mental anguish resulting from an injury to his or her child. *Michals v. William T. Watkins Memorial United Methodist Church,* Ky. App., 873 S.W.2d 216 (1994); *Wilhoite v. Cobb,* Ky.App., 761 S.W.2d 625 (1988); *cf. Hetrick v. Willis,* Ky., 439 S.W.2d 942 (1969).

The trial judge also dismissed Jeffrey's Consumer Protection Act claim. The Consumer Protection Act has no application to third-party claims. *Anderson v. National Security Fire & Casualty Co.,* Ky.App., 870 S.W.2d 432 (1993). Under the factual scenario of this case, Shelburne was the insured under the liability coverage of Motorists Mutual's policy. *Henderson v. Selective Insurance Co.,* 242 F.Supp. 48 (W.D.Ky.1965), *aff'd,* 369 F.2d 143 (6th Cir.1966); *Ocean Accident & Guaranty Co., Ltd. v. Schmidt,* 46 F.2d 269 (6th Cir.1931). Even Clinton Miller admitted that Jeffrey Glass was a third-party claimant against Motorists Mutual's liability coverage. The only first-party

claim in this case was Jeffrey's claim against Motorists Mutual's UIM coverage. As will be discussed *infra*, he had no valid claim to the UIM coverage; thus, he had no valid claim under the Consumer Protection Act.

Finally, the trial judge granted Farm Bureau's motion for a directed verdict on the issue of punitive damages, but denied its motion for a directed verdict on its claimed violation of the UCSPA. These rulings are inconsistent with our holding in *Wittmer v. Jones*, Ky., 864 S.W.2d 885, 890 (1993) that before a cause of action for a violation of the UCSPA exists, there must be evidence sufficient to warrant punitive damages. (*Wittmer v. Jones* was rendered two months after the conclusion of the trial of this action.)

The jury was instructed on seven sections of the UCSPA with respect to Motorists Mutual and three sections with respect to Farm Bureau. As to each insurer, the jury was instructed that if they found a violation of any section, they could award compensatory damages consisting of the reasonable costs and expenses incurred in bringing this suit and "whatever embarrassment, humiliation and mental anguish" Jeffrey Glass suffered as a direct result of the failure to settle his claim. The jury was also authorized to award punitive damages against Motorists Mutual. Instruction No. 6 was as follows:

> You are instructed the Court has ruled that the Plaintiff, Jeffrey A. Glass, has available to him insurance coverage under his policies in an amount not to exceed $200,000.00.

> What sum of money, if any, do you award the Plaintiff, Jeffrey A. Glass, under this Instruction not to exceed $200,000.00?

We now know this instruction pertained to the trial judge's conclusion that there was $200,000.00 in stacked UIM coverage available to Jeffrey for this accident. However, the jury could well have believed from this instruction that $200,000.00 was all that was available to pay the $928,-208.12 which they had awarded Jeffrey for

compensatory and punitive damages under the UCSPA instructions. Not surprisingly, the jury awarded the entire $200,000.00 authorized under this instruction. The verdicts were as follows:

Against Motorists Mutual:

| | | |
|---|---|---|
| $ 9,208.11 | — | Costs and expenses |
| –0– | — | Embarrassment, humiliation, anguish |
| 485,000.00 | — | Punitive damages |
| 200,000.00 | — | Underinsured motorists coverage payments |

$694,208.11

Against Farm Bureau:

| | | |
|---|---|---|
| $ 9,208.12 | — | Costs and expenses |
| 434,000.00 | — | Embarrassment, humiliation, anguish |

$443,208.12

The jury also found under an interrogatory instruction that Motorists Mutual failed to make a good faith attempt to settle Jeffrey's claim within thirty days from the date on which it was furnished with notice or proof of loss. This finding was the basis for the award in the judgment of $231,402.70 in attorney fees.

## VI. THE UNDERINSURED MOTORIST CLAIMS.

The trial judge concluded that Jeffrey could stack the UIM coverages for the four vehicles described in the two Motorists Mutual policies. *See Allstate Insurance Co. v. Dicke*, Ky., 862 S.W.2d 327 (1993). However, since one of those vehicles was added to the policy after the date of this accident, the maximum available UIM coverage under both Motorists Mutual policies was $150,000.00. In fact, none of that available coverage was applicable to this accident.

On the date of this accident, KRS 304.39–320 contained the following offset provision:

> [T]he insurance company agrees to pay its own insured for such uncompensated damages as he may recover on account of injury due to a motor vehicle accident because the judgment recovered against the owner of the other vehicle exceeds the policy limits thereon, to the extent of the policy limits on the vehicle of the party recovering less the amount paid by the liability insurer of the party recovered against.

In *LaFrange v. United Services Automobile Association, supra*, we held that

this statutory provision meant exactly what it said, *i.e.*, an insurance company is required to pay under its UIM coverage only to the extent that the UIM coverage exceeds the liability policy limits of the tortfeasor's insurance policy. In that case, the limits of the injured insured's UIM coverage were $25,000.00 and the limits of the tortfeasor's liability coverage were also $25,000.00. "When we offset $25,000 against $25,000, the remainder is zero." *Id.* at 413.

■ The offset provision was deleted by a statutory amendment effective July 15, 1988. Ky. Acts 1988, Ch. 180, § 1. Since the amendment was not expressly declared to be retroactive, it does not affect claims arising out of injuries which occurred prior to its effective date. KRS 446.080(3); *cf. Koching v. International Armament Corp.*, Ky., 772 S.W.2d 634 (1989).

As also pointed out in *LaFrange, supra,* the insurance contract could provide broader coverage than required by the statute. However, as noted earlier, the policy defines an underinsured motor vehicle as "a land motor vehicle ... to which a bodily injury liability ... policy applies at the time of the accident but its limit for bodily injury liability is less than the limit of liability for this coverage." [17] The UIM portion of the policy further provides:

> Any amounts otherwise payable for damages under this coverage shall be reduced by all sums:
>
> 1. Paid because of the bodily injury by or on behalf of persons or organizations who may be legally responsible. This includes all sums paid under part A.[18]

Part A is the liability coverage under which Shelburne was covered as an additional insured. Thus, the policy mirrors the statutory offset provision in effect at the time of this accident.

Even if the offset provision did not apply in this case, Jeffrey still could not recover under the UIM coverage of these policies. The language of the post-July 15, 1988 version of KRS 304.39–320 includes the following:

> Every insurer shall make available upon request to its insureds underinsured motorist coverage, whereby subject to the terms and conditions of such coverage not inconsistent with this section the insurance company agrees to pay its own insured for such uncompensated damages as he may recover on account of injury due to a motor vehicle accident because the judgment recovered against the owner of *the other vehicle* exceeds the liability policy limits thereon, to the extent of the underinsurance policy limits *on the vehicle of the party recovering.* (Emphasis added.)

■ The statute contemplates that the underinsured tortfeasor will be operating a different vehicle than the vehicle providing UIM coverage for the injured claimant. Conceptually, the purpose of the statute is to give the insured the right to purchase additional liability coverage for the vehicle of a prospective underinsured tortfeasor. *LaFrange, supra,* at 414. The statute does not authorize recovery against both the liability and UIM coverages of the same policy. *Pridham v. State Farm Mutual Insurance Co.*, Ky. App., 903 S.W.2d 909 (1995); *Windham v. Cunningham,* Ky.App., 902 S.W.2d 838 (1995). The issue then becomes whether the policy, itself, permits such recovery; and/or whether Jeffrey can recover under the UIM coverage of his parents' Motorists Mutual policy, under which he is not a liability claimant but is an additional insured for UIM purposes. Both policies exclude from the definition of an underinsured vehicle any vehicle "[o]wned by or furnished or available for the regular use of you or any family member," [19] which

---

17. Policy Provision Amendments to Part C of the policy.

18. Part C, Limit of Liability, paragraph B1.

19. Part C, Insuring Agreement, paragraph C, exception 1.

clearly applies to the 1980 pickup truck involved in this accident. The validity of this exclusion was discussed at length by the Court of Appeals in *Windham v. Cunningham, supra,* at 841. We agree with the Court of Appeals' analysis and with its conclusion that the exclusion is not against public policy. "The purpose of UIM coverage is not to compensate the insured or his additional insureds from his own failure to purchase sufficient liability insurance." *Id.*

The Glasses argue that they paid a premium for UIM coverage, thus the exclusion is void because of the "doctrine of reasonable expectations." That principle or doctrine, first enunciated by this Court in *Ohio Casualty Insurance Co. v. Stanfield,* Ky., 581 S.W.2d 555, 559 (1979), does not pertain to whether a premium was paid for coverage which is excluded, but rather to the clarity of the exclusionary language. As we explained in *Simon v. Continental Insurance Co.,* Ky., 724 S.W.2d 210, 212–13 (1986):

> The gist of the doctrine is that the insured is entitled to all the coverage he may reasonably expect to be provided under the policy. Only an unequivocally conspicuous, plain and clear manifestation of the company's intent to exclude coverage will defeat that expectation.
>
> . . .
>
> The doctrine of reasonable expectations is used in conjunction with the principle that ambiguities should be resolved against the drafter in order to circumvent the technical, legalistic and complex contract terms which limit benefits to the insured.

(Quoting R.H. Long, *The Law of Liability Insurance,* § 5.10B.) There is nothing ambiguous about this exclusion. A vehicle owned by or furnished or available for the regular use of the named insured or a family member is not an "underinsured vehicle." The obvious reason for the exclusion is that the named insured can avoid the fact of underinsurance by simply purchasing additional liability insurance coverage for his vehicle.

The Glasses' Consumer Protection Act claim was also premised upon their perception that Motorists Mutual sold them policies of insurance with UIM coverage that was illusory. The coverage was not illusory; it just did not apply to the facts of this case. If this had been a two-vehicle accident with Shelburne operating his own vehicle, and if Shelburne's liability insurance coverage had been only $25,000.00, then Jeffrey could have recovered $25,000.00 in UIM payments for each of the three vehicles to which the UIM coverage applied. If the accident had occurred after July 15, 1988, he could have recovered $50,000.00 for each of the three covered vehicles.

If there had been a valid UIM claim in this case, it should have been presented to the jury in the same manner as the liability claim against Shelburne would have been presented had it not been settled, except that Motorists Mutual would have been the only named defendant. The trial should have been bifurcated with the negligence (UIM) claim tried first, followed by the bad faith claim. *Wittmer v. Jones, supra,* at 891. The jury should have been instructed to apportion liability according to comparative fault and to determine damages for the injuries sustained. *See* 2 Palmore, *Kentucky Instructions to Juries (Civil),* § 16.55 (4th ed. Anderson 1989). Only if the verdict equaled or exceeded the sum of the applicable liability and UIM coverages would Jeffrey have been entitled to the UIM policy limits. Thus, if there had been $200,000.00 UIM coverage available in this case, Jeffrey would have been entitled to the full amount only if the apportioned verdict of the jury equaled or exceeded $350,000.00. If the verdict did not exceed the $150,000.00 liability limits, he would have been entitled to none of the UIM coverage. Clearly, it was improper to merely tell the jurors how much coverage was available and ask them how much of that coverage they wanted Jeffrey to receive.

## VII. THE UCSPA CLAIMS.

The common law cause of action premised upon an insurance company's bad faith refusal to settle a claim arose initially in the context of an insurer's failure to settle a liability claim against its own insured, which resulted in a verdict in excess of the insured's policy limits. *E.g.*, *State Farm Mutual Automobile Insurance Co. v. Marcum*, Ky., 420 S.W.2d 113 (1967), *overruled on other grounds, Manchester Insurance & Indemnity Co. v. Grundy, supra*, at 500. In *Manchester*, we recognized that under the principle of privity of contract, the cause of action belonged only to the liability insured; but that the insured could assign it to the liability plaintiff in consideration for a release of the insured from any liability in excess of the policy limits. As assignee of the insured, the successful plaintiff could then bring the "bad faith" action in a derivative capacity against the insurer to recover the excess amount of the verdict. Punitive damages were not recoverable, because the action was considered to be one for breach of contract. This type of action is referred to as a "third-party bad faith" action. Mere negligent failure to settle within the policy limits or errors of judgment are insufficient to constitute bad faith. *Harvin v. United States Fidelity & Guaranty Co.*, Ky., 428 S.W.2d 213, 215 (1968); *American Surety Co. of N.Y. v. J.F. Schneider & Son, Inc.*, Ky., 307 S.W.2d 192, 195 (1957), *overruled on other grounds, Manchester, supra*, at 500. In *Manchester, supra*, the test for bad faith in a third-party action was stated as follows:

> Did the insurer's failure to settle expose the insured to an unreasonable risk of having a judgment rendered against him in excess of the policy limits? If the question is answered "yes" by the trial court after weighing and evaluating the various factors, then the insurer is guilty of "bad faith."

*Id.* at 501. The "various factors" to be considered in determining the existence of bad faith are (1) whether the plaintiff offered to settle for the policy limits or less, (2) whether the insured made a demand for settlement on the insurer, and (3) the probability of recovery and of a jury verdict which would exceed the policy limits. *Id.* at 500.

In Kentucky, the common law tort of "first-party bad faith" had its genesis in *Feathers v. State Farm Fire & Casualty Co.*, Ky.App., 667 S.W.2d 693 (1983), which was a claim against a homeowner's policy for a fire loss. Prior to *Feathers*, damages for breach of a first-party insurance contract were limited to the amount due under the contract. *Deaton v. Allstate Insurance Co.*, Ky.App., 548 S.W.2d 162 (1977); *General Accident Fire & Life Assurance Corp. v. Judd*, Ky., 400 S.W.2d 685 (1966). Punitive damages could not be awarded because "punitive damages ordinarily are not recoverable for a breach of contract." *Judd, supra*, at 688. In *Feathers, supra*, the Court of Appeals viewed the failure of an insurance company to settle a first-party claim in good faith as a tort, not a breach of contract.

> [T]he proceeds of the policy may not be withheld unless there is a substantial breach of the contract by the policyholder. Whether or not State Farm was justified in withholding and denying the payment of the losses will be resolved by trial. We simply say that if State Farm was not justified in its actions, then its conduct was tortious against the policyholder for which consequential and punitive damages may be presented to the fact finder.

*Id.* at 696–97. *Feathers* subsequently was overruled by *Federal Kemper Insurance Co. v. Hornback*, Ky., 711 S.W.2d 844 (1986), which in turn was overruled by *Curry v. Fireman's Fund Insurance Co.*, Ky., 784 S.W.2d 176 (1989). In *Curry*, we incorporated by reference the dissenting opinion of Justice Leibson in *Federal Kemper. Curry, supra*, at 178.

In addition to common law third-party and first-party bad faith claims, we have recognized two "statutory bad faith"

causes of action, both predicated upon KRS 446.070, which states:

A person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, ...

In *Stevens v. Motorists Mutual Insurance Co.,* Ky., 759 S.W.2d 819 (1988), we held that the Consumer Protection Act provides an insured under a homeowner's policy with a remedy against the conduct of his insurance company, if such conduct constitutes an unlawful act as defined in KRS 367.170. In that case, a claim that the insurance company misrepresented the contents of an engineering report and terminated settlement when there apparently were reasonable grounds for a compromise was held to state a cause of action under the statute. More specifically, we held in *State Farm Mutual Automobile Insurance Co. v. Reeder,* Ky., 763 S.W.2d 116 (1988), that a violation of the UCSPA could create a private cause of action for a third-party claimant damaged as a result of the violation of one or more of its provisions. *Reeder* did not address the degree of proof necessary to prevail on such a claim. That issue awaited our decision in *Wittmer v. Jones, supra.*

In *Wittmer,* we returned to Justice Leibson's dissenting opinion in *Federal Kemper, supra,* to determine what degree of proof was necessary to sustain a claim of bad faith. Of course, both *Federal Kemper* and *Curry* were common law first-party bad faith claims, whereas *Wittmer* was a statutory third-party bad faith claim. We held in *Wittmer* that the same principles apply to third-party claims as to first-party claims. *Wittmer, supra,* at 890. Those principles were enunciated as follows:

[A]n insured must prove three elements in order to prevail against an insurance company for alleged refusal in bad faith to pay the insured's claim: (1) the insurer must be obligated to pay the claim under the terms of the policy; (2) the insurer must lack a reasonable basis in law or fact for denying the claim; and

(3) it must be shown that the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed.... [A]n insurer is ... entitled to challenge a claim and litigate it if the claim is debatable on the law or the facts.

*Id.* at 890 (quoting Justice Leibson's dissenting opinion in *Federal Kemper, supra,* at 846–47).

Again quoting from the *Federal Kemper* dissent, we held in *Wittmer* that in order to justify an award of punitive damages, there must be proof of bad faith sufficient for the jury to conclude that there was conduct that was outrageous, because of the defendant's evil motive, or his reckless indifference to the rights of others. If the evidence suffices to justify punitive damages under this standard, a cause of action for statutory bad faith premised on a violation of the UCSPA may be maintained. If not, the cause of action cannot be maintained. *Wittmer, supra,* at 890–91. Finally, we held in *Wittmer* that there can be no private cause of action for a mere "technical violation" of the UCSPA. *Id.* at 890. As required by KRS 446.070, a condition precedent to bringing a statutory bad faith action is that the claimant was damaged by reason of the violation of the statute.

■■■ Although the jury in this case was instructed on seven separate sections of the UCSPA, the allegations against Motorists Mutual and Farm Bureau boil down to a claim that they did not promptly offer to pay Jeffrey Glass what his claim was reasonably worth. Pursuant to *Wittmer,* to prevail on this claim, Jeffrey needed to prove that the conduct of the insurers was outrageous, because of an evil motive or reckless indifference to his rights. In applying that standard to the evidence in this case, it must be kept in mind that mere delay in payment does not amount to outrageous conduct absent some affirmative act of harassment or deception. *Cf. Zurich Insurance Co. v. Mitchell,* Ky., 712 S.W.2d 340 (1986). In other words, there must be proof or evidence supporting a

reasonable inference that the purpose of the delay was to extort a more favorable settlement or to deceive the insured with respect to the applicable coverage.

In addition to the duties owed to Jeffrey Glass, both insurers owed a duty to their liability insured, Shelburne, to protect him from a potential excess judgment. *Manchester Insurance & Indemnity Co. v. Grundy, supra.* That would include obtaining from the Glasses a release of all claims against him in exchange for the payment of a liability settlement. *Coots v. Allstate Insurance Co.,* Ky., 853 S.W.2d 895, 901 (1993). If Motorists Mutual had paid its policy limits to Glass before Farm Bureau arrived on the scene, and obtained a release in favor of Shelburne in exchange for its payment, the Glasses would have lost access to Farm Bureau's liability coverage. Since Motorists Mutual and Farm Bureau were insuring the same tortfeasor, the principle enunciated in *Richardson v. Eastland, Inc.,* Ky., 660 S.W.2d 7 (1983), that the release of one tortfeasor does not discharge another, would not apply. Even if Gillahan's initial $25,000.00 offer could be interpreted as a violation of the UCS-PA, the Glasses were not damaged by that violation. They would have been damaged if Gillahan had offered his policy limits, the offer had been accepted, and the Glasses had executed a release in favor of Shelburne. After August 17, 1988, the date Farm Bureau was first notified of this accident, Motorists Mutual never offered to pay less than the equivalent of its full policy limits to settle the case. The fact that it offered a structured settlement as opposed to a lump sum cash payment cannot be characterized as outrageous conduct, an evil motive, or reckless indifference to the rights of the Glasses. To the contrary, it would have been much simpler for Motorists Mutual to have paid its limits in a lump sum and obtained a release.

It was the Glasses, not Motorists Mutual, who were unwilling to settle this claim, because of their concern that all of the settlement money would be claimed by Humana in satisfaction of its subrogation claim. For a discussion of the respective rights of an injured claimant and his subrogee to a limited fund of money, see *Wine v. Globe American Casualty Co.,* Ky., 917 S.W.2d 558 (1996). Regardless, Motorists Mutual owed no duty to Jeffrey Glass to settle a liability claim which Jeffrey, himself, had assigned by contract to Humana. The remainder of Jeffrey's claim of bad faith against Motorists Mutual was premised on Motorists' refusal to pay its UIM coverage and its property damage liability coverage. Since neither of those coverages applied to this accident, that argument necessarily fails as well.

Farm Bureau did not receive notice of this accident until August 17, 1988. As the "excess" insurer, it did not owe any coverage until Motorists Mutual's primary coverage was exhausted. *Ohio Casualty Insurance Co. v. State Farm Mutual Automobile Insurance Co.,* Ky., 511 S.W.2d 671, 674 (1974) (quoting Appleman, *Insurance Law & Practice,* § 4914). Upon receipt of proof of Motorists Mutual's intent to pay its liability limits, Farm Bureau responded positively to every request for authority received from Hackney. It is not bad faith *per se* for an insurance company to offer to settle for less than its policy limits. That is particularly true where, as here, the claimants *never demanded payment of the policy limits or any other sum* prior to retaining an attorney. *Davis v. Home Indemnity Co.,* Ky., 659 S.W.2d 185, 189 (1983); *Manchester Insurance & Indemnity Co. v. Grundy, supra,* at 500. Nor is it bad faith to refuse a demand to settle for a sum in excess of the policy limits, such as the demands made of both insurers by the Glasses' attorney. *Cooper v. Automobile Club Insurance Co.,* Ky.App., 638 S.W.2d 280, 282 (1981).

The Glasses assert that Joel Depp, on behalf of Farm Bureau, acted in bad faith either in evaluating Jeffrey's claim too low, or in not evaluating it at all.[20] Depp's claimed evaluation was based

---

**20.** On petition for rehearing, the Glasses as-

serted for the first time that since Depp's file

upon the documentation available at the time the evaluation was made, long prior to the time when Farm Bureau's liability as excess insurer ripened. That did not occur until Farm Bureau was notified of Motorists Mutual's intent to pay its policy limits. Even if Depp made an incorrect evaluation, or no evaluation at all, such would not constitute conduct that was "outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Wittmer, supra,* at 890. The UCSPA does not require that a claim be evaluated, or that it be evaluated correctly. It only requires that payment of a claim not be refused without conducting a reasonable investigation based on all available information, KRS 304.12–230(4), and that a good faith attempt be made to effectuate a prompt, fair and equitable settlement, KRS 304.12.230(6). Furthermore, since Depp never received a settlement demand from the Glasses and never refused a request from Hackney for additional authority with which to increase the settlement offer, his action or inaction with respect to evaluating this claim resulted in no damage to the Glasses. Absent resultant damage, there can be no cause of action premised upon the violation of a statute, *i.e.,* the UCSPA. KRS 446.070.

■ The Glasses also assert that Farm Bureau's reliance on the purported May 27, 1989 settlement constituted bad faith. In view of Hackney's deposition testimony and existing law as expressed in *Barr v. Gilmour, supra,* that defense not only was fairly debatable, it had substantial merit. The Glasses' contention that Farm Bureau's payment of its policy limits after rendition of the partial summary judgment was a "judicial admission" that the settlement defense was not fairly debatable is preposterous. If Farm Bureau had not offered its policy limits after losing on the settlement issue, the Glasses would now be claiming that it was bad faith for Farm Bureau to withhold its policy limits after it had been judicially determined that

does not contain a written notation of his claimed evaluation, the jury could have rea-

it had no valid defense. We reiterate what Justice Leibson said in his dissenting opinion in *Federal Kemper Insurance Co. v. Hornback,* incorporated by reference in *Curry v. Fireman's Fund Insurance Co.,* and quoted verbatim in *Wittmer v. Jones,* that an insurer is entitled to challenge a claim and litigate it if the claim is debatable on the law or the facts. As in *Wittmer v. Jones, supra,* the trial judge correctly recognized that there was insufficient evidence for a claim of punitive damages against Farm Bureau, but failed to recognize that by the same token Farm Bureau was entitled to a directed verdict on the claim of statutory bad faith.

■ Before leaving this issue, we deem it necessary to address those instructions which permitted the jury to assess damages for Jeffrey Glass's "embarrassment, humiliation and mental anguish" suffered as a result of the failure of the insurers to settle his claim. While damages for anxiety and mental anguish are recoverable in an action for statutory bad faith, *FB Insurance Co. v. Jones,* Ky.App., 864 S.W.2d 926 (1993), entitlement to such damages requires either direct or circumstantial evidence from which the jury could infer that anxiety or mental anguish in fact occurred. The proof must be clear and satisfactory; and evidence based on conjecture will not support a recovery for such damages. 25A C.J.S. *Damages,* § 162(7); *cf. Mountain Clay, Inc. v. Commonwealth, Commission on Human Rights,* Ky.App., 830 S.W.2d 395, 397 (1992); *Kentucky Commission on Human Rights v. Fraser,* Ky., 625 S.W.2d 852, 856 (1981). In the absence of any evidence that Jeffrey suffered any embarrassment, humiliation or mental anguish as a result of the settlement negotiations, it was error to submit that element of damages to the jury.

### VIII. ATTORNEY FEES.

The attorney fees were awarded pursuant to KRS 304.12–235(3), which provides as follows:

sonably concluded that he never made an evaluation of this claim.

If an insurer fails to settle a claim within the time prescribed in subsection (1) of this section and the delay was *without reasonable foundation,* the insured person or health care provider shall be entitled to be reimbursed for his reasonable attorney's fees incurred. No part of the fee for representing the claimant in connection with this claim shall be charged against benefits otherwise due the claimant. (Emphasis added.)

 This section applies only to an insurer's negotiations with its own policyholder or the policyholder's health care provider. Thus, the trial judge correctly held that Farm Bureau could not be liable for attorney fees. As noted earlier, the jury found under an interrogatory instruction that Motorists Mutual did not make a good faith effort to settle Jeffrey's claim within thirty days of receipt of notice or proof of loss. In fact, the version of KRS 304.12–235(1) in effect at the time of this accident required a good faith attempt to settle the claim within sixty days, not thirty days. Furthermore, the interrogatory instruction did not require the jury to determine whether the failure to settle within the specified time period was "without reasonable foundation." Regardless, Motorists Mutual was entitled to a directed verdict on this issue as well. Farm Bureau was not put on notice of its excess liability exposure until more than sixty days after notice was given to Motorists Mutual. Certainly, the claim could not and should not have been settled without Farm Bureau's participation. Also, simple logic dictates that a condition precedent to liability for failure to settle must be the claimant's willingness to accept a settlement. Even after Motorists Mutual offered its policy limits, the Glasses refused to settle because of their concern about Humana's subrogation claim. As a matter of law, there was a "reasonable foundation" for Motorists Mutual's failure to settle this claim within sixty days of its receipt of notice. Therefore, KRS 304.12–235 was not available as authority for an award of attorney fees. Absent a written agreement or authorizing statute, a party

to an action may not recover attorney fees from the adverse party. *Louisville Label, Inc. v. Hildesheim,* Ky., 843 S.W.2d 321, 326 (1992).

The Glasses assert that because their attorney was not named as a party in Motorists Mutual's notice of appeal from the final judgment, it is precluded from now contesting that issue. *Citizens Fidelity Bank and Trust Co. v. Fenton Rigging Co.,* Ky., 522 S.W.2d 862 (1975). However, since the judgment did not award the fee directly to the attorney, there was no reason for the attorney to be named as a party to the appeal. *Knott v. Crown Colony Farm, Inc.,* Ky., 865 S.W.2d 326, 331 (1993).

## IX. COSTS AND EXPENSES.

The jury was permitted to and did award "costs and expenses" in the sum of $18,416.23, which they divided equally between Motorists Mutual and Farm Bureau. Clearly, the Glasses are entitled to their costs, since they prevailed on their liability claims against Shelburne. KRS 453.040(1)(a); *Cheatham v. Harmon,* 182 Ky. 35, 206 S.W. 16 (1918); *Harrodsburg Water Co. v. City of Harrodsburg,* Ky., 89 S.W. 729 (1905). In fact, the Glasses filed a statement of costs after entry of the judgment in the sum of $1,712.50, the only objection to which was that the same costs had been included in the verdict as damages for "costs and expenses." There is no basis for an award of any costs or expenses incurred by the Glasses in this litigation except those authorized by KRS 453.040(1)(a).

For the reasons stated in this opinion, we reverse the Court of Appeals and vacate the judgment of the Shelby Circuit Court, except insofar as the judgment awards Jeffrey Glass those costs set forth in his statement of costs filed pursuant to KRS 453.040(1)(a), in which respect the judgment is affirmed.

GRAVES, JOHNSTONE, and STEPHENS, JJ., concur.

LAMBERT, C.J., dissents by separate opinion along with a supplemental dissenting opinion, with STUMBO and WINTERSHEIMER, JJ., joining the dissenting and supplemental dissenting opinions.

LAMBERT, Justice, dissenting.

I dissent from the majority opinion. There are substantial aspects of that opinion with which I disagree and others which exceed the analysis required for resolution of the issues. Portions of the majority opinion are laden with obiter dictum which may modify Kentucky law in future cases in ways wholly beyond our present contemplation.

The majority opinion in the Court of Appeals by Judge Miller, with Judge Combs concurring and Judge Wilhoit dissenting, appropriately addresses and resolves the issues presented and gives due regard to trial court discretion regarding the admission and exclusion of evidence and proper regard for the jury verdict. Accordingly, I file herewith the majority opinion in the Court of Appeals as my dissenting opinion in this case.

On May 13, 1988, appellee/cross-appellant, Jeffrey A. Glass, received injuries and ultimate loss of his right arm, the result of a one-car accident. He was a passenger in his 1980 Ford pickup truck which, at the time of the accident, was being operated by one Stephen Shelburne.

Jeffrey's truck was insured by appellant/cross-appellee, Motorists Mutual Insurance Company (Motorists or Motorists Mutual). His policy contained a bodily injury liability limit of $50,000.00 and $50,000.00 "underinsured motorist" (UIM) coverage. Jeffrey, a teenager, lived with his parents, cross-appellants/Garnett Doyle Glass and Brenda Glass (the Glasses). At the time the Glasses had two other vehicles insured with Motorists, each with a $50,000.00 UIM clause.[1] Shelburne, the driver, was insured by appellant/cross-appellee, Kentucky Farm Bureau Mutual Insurance Company (Farm Bureau) with a bodily injury liability limit of $100,-000.00.

After the accident a Motorists Mutual claims representative contacted Jeffrey and commenced settlement negotiations within the $50,000.00 limit provided on the pickup. It was then realized there might be excess insurance available from Farm Bureau, Shelburne's insurer. Thereafter Motorists and Farm Bureau commenced negotiations with the Glass family to settle all claims within the $50,000.00 limit on the pickup and the $100,000.00 limit on Shelburne.

With the aid of an expert employed by Motorists Mutual, a structured settlement was explored. The settlement was intended to be funded by annuities purchased by Motorists ($485,000.00) and Farm Bureau ($434,000.00) over Jeffrey's life. At some point after discussion of the structured settlement to be funded by the annuities, negotiations came to an impasse and Jeffrey sought advice of counsel. On May 3, 1990, the Glasses filed suit against Motorists Mutual and Farm Bureau alleging, *inter alia*, bad faith settlement practices.[2]

---

1. The record reveals that the Glasses had two insurance policies with Motorists Mutual. Policy Number 5342–06–224865–00A will be referred to in the course of this opinion as "Policy A." This policy covered two motor vehicles and insured Garnett Doyle Glass and Brenda Glass. Policy Number 5342–04–224866–11D will be referred to as "Policy D." At the time of the accident, this policy covered Jeffrey's truck and, after the accident, also covered another motor vehicle. Policy D insured Garnett, Brenda, and Jeffrey. Collec-

tively, we will sometimes refer to Policy A and Policy D as "the Glasses' policies." Policies A and D substantively contained identical language.

2. The suit named Stephen Shelburne as a tortfeasor/defendant. Shelburne was dismissed from the proceedings on May 6, 1993, when Motorists Mutual and Farm Bureau paid their respective bodily injury policy limits.

In 1993 an extensive jury trial resulted in the following awards:

**Against Motorists**

| | | |
|---|---|---|
| 1. | $485,000.00 | punitive damages |
| 2. | 200,000.00 | liability on UIM coverage |
| 3. | 9,208.11 | reasonable costs |
| 4. | 231,402.70 | attorney fees |
| | $925,610.81 | TOTAL |

**Against Farm Bureau**

| | | |
|---|---|---|
| 1. | $ 9,208.12 | reasonable costs |
| 2. | 434,000.00 | mental anguish, etc. |
| | $443,208.12 | TOTAL |

Judgment was entered upon the foregoing awards, thus precipitating these appeals.

### Motorists Mutual's Appeal

We first address the issue of Jeffrey's UIM coverage. The circuit court concluded that Jeffrey was entitled to $200,000.00 of UIM coverage. Conversely, Motorists contends that no such coverage was available to Jeffrey and that a directed verdict was mandated upon this issue. Ky. R. Civ. P. (CR) 50.01. Motorists contends that UIM coverage is unavailable to Jeffrey because KRS 304.39–320 contemplates such coverage only in multi-vehicle accidents. However, we are reminded of the following:

> KRS 304.39–320, "Underinsured motorist coverage," is part of the Motor Vehicle Reparations Act (MVRA), and, as such, is remedial legislation which should be generally construed to accomplish its stated purposes. *Cf. Bishop v. Allstate Ins. Co.,* Ky., 623 S.W.2d 865 (1981).

*LaFrange v. United Serv. Auto. Ass'n,* Ky., 700 S.W.2d 411, 413 (1985).

The stated purposes of the MVRA are enunciated in KRS 304.39–010. One such purpose found in subsection (3) reads as follows:

> To encourage prompt medical treatment and rehabilitation of motor vehicle accident victim by providing for prompt payment of needed medical care and rehabilitation.

If KRS 304.39–320 is construed to effect the above-stated purpose, we believe it cannot be so narrowly interpreted as to encompass only multi-vehicle accidents. We think such construction repugnant to KRS 304.39–320 and to the very pith of the MVRA.

Motorists Mutual also avers that Jeffrey is not entitled to UIM coverage because such coverage is specifically excluded from an "insured vehicle." In support of same, Motorists relies upon the following policy language:

> When the term **uninsured motor vehicle** is used in Part C, it shall also include **underinsured motor vehicle**
> . . . .

PART C—UNINSURED MOTORISTS
COVERAGE

. . .

> C. **"Uninsured motor vehicle"** means a land motor vehicle or trailer of any type:
>
> 1. To which no bodily injury liability bond or policy applies at the time of the accident.
>
> 2. To which a bodily injury liability bond or policy applies at the time of the accident. In this case its limit for bodily injury liability must be less than the minimum limit for bodily injury liability specified by the financial responsibility law of the state in which **your covered auto** is principally garaged.
>
> . . .
>
> However, **uninsured motor vehicle** does not include any vehicle or equipment:
>
> 1. Owned by or furnished or available for the regular use of you or any **family member.**
>
> . . .

Upon close scrutiny the terms "uninsured motor vehicle" and "underinsured motor vehicle" may be used interchangeably throughout Part C—Uninsured Motor Coverage, except in relation to Part C, subsection c. Subsection c attempts to define the term "uninsured motor vehi-

cle;" thus, we think it perspicuous that "underinsured motor vehicle" cannot therein be used interchangeably. Because the "owned" vehicle exclusion is set forth in subsection c, we are of the opinion that the exclusion can be applied only to an uninsured motor vehicle. Thus we believe no "owned" vehicle exclusion exists regarding UIM coverage. Finally, upon the following perlustration of the Glasses' policies, we believe Jeffrey was protected by $150,000.00 of UIM coverage.

The policy language states in relevant part as follows:

> **"Underinsured motor vehicle"** means a land *motor vehicle* or trailer of any type *to which a bodily injury liability bond or policy applies at the time of the accident* but its limit for bodily injury liability is less than the limit of liability for this coverage. (Emphasis added.)

We view this definition—"underinsured motor vehicle"—as ambiguous. The phrase "motor vehicle ... to which a bodily injury liability ... policy applies at the time of the accident ..." may be susceptible to inconsistent interpretations. One interpretation is that only the bodily injury policy covering the motor *vehicle* at the time of the accident is applicable; the other interpretation is that the bodily injury policy covering the *vehicle* and, likewise, any such policy covering the *driver* are applicable. We recognize that such interpretations are inconsistent only when the owner of the vehicle and the driver of the vehicle are not the same, as in the case at hand. Because the definition of an "underinsured motor vehicle" is subject to inconsistent interpretations, we are bound to resolve the ambiguity in favor of the insured, Jeffrey. *See Transport Ins. Co. v. Ford*, Ky.App., 886 S.W.2d 901 (1994), and *Davis v. American States Ins. Co.*, Ky.App., 562 S.W.2d 653 (1977).

There is little doubt that the most favorable interpretation to the insured/Jeffrey is that only the motor vehicle's bodily injury policy needs consideration and not any additional policy on the tortfeasor/driver. As a result, only Policy D's bodily injury liability on Jeffrey's truck at the time of the accident must be weighed when determining whether the vehicle was, in fact, underinsured.

The Glasses' policies clearly and unambiguously state that a vehicle is underinsured when "its limit for bodily injury liability is less than the limit of liability for this coverage." The bodily injury liability limit on Jeffrey's vehicle was $50,000.00, and we believe that the limit of liability for "this coverage" (underinsured) should be $150,000.00. We arrive at this figure by stacking the UIM coverage applicable to each of the Glasses' three insured vehicles at the time of the accident. Each vehicle had $50,000.00 UIM coverage. We do not believe the fourth car—added to Policy D after the accident—should be considered. We think it appropriate to stack UIM coverage when initially determining whether Jeffrey was underinsured.[3] Hence, we believe Jeffrey's vehicle was, indeed, an "underinsured motor vehicle," as defined by the Glasses' policies.

More succinctly, we view the applicable sum of bodily injury liability as $50,000.00 under Policy D and the applicable sum of UIM coverage of Policies A and D as $150,000.00. Because the limit for bodily injury liability ($50,000.00) is less than the limit of liability for UIM coverage ($150,000.00), we believe that Jeffrey's vehicle was underinsured, as defined by Glasses' policies. Having so concluded, we now examine the Glasses' policies to determine the exact amount of UIM coverage to which Jeffrey is entitled.

**3.** We are persuaded by the reasoning in *Wickline v. United States Fidelity & Guaranty Co.*, 530 So.2d 708, 712–713 (Miss.1988), wherein the Mississippi Supreme Court held that the stacking of an injured's uninsured motorist coverage is acceptable for "the purpose of meeting the 'uninsured motor vehicle' definition."

The Glasses' policies state in relevant part as follows:

We will pay under this coverage only after the limits of liability under any applicable bodily injury liability bonds or policies have been exhausted by payment of judgments or settlements.

We believe this sentence susceptible to inconsistent interpretations and therefore ambiguous. One possible interpretation is that Motorists would pay UIM benefits (1) only after exhaustion of applicable bodily injury policy/policies and (2) only in the amount remaining uncompensated after such policies have been exhausted. Consequently, the UIM payment would be reduced by applicable bodily injury payments. Another possible interpretation is that Motorists would pay UIM benefits (1) only after exhaustion of applicable bodily injury policy/policies, but (2) in the full amount of damages incurred irrespective of any applicable bodily injury payments. Consequently, the UIM payment would not be reduced by any applicable bodily injury payments.

We are compelled to adopt the latter interpretation, it being more favorable to the insured/Jeffrey. *See Transport Ins. Co., supra,* and *Davis, supra.* Because the UIM payment ($150,000.00) should not be reduced by "any applicable bodily injury" payments, we are of the opinion Jeffrey is entitled to the full $150,000.00 of UIM coverage.

A controversy exists over the effect of KRS 304.39–320 (UIM coverage) as it applies to this case. On July 15, 1988, the statute was amended to remove certain "offset" language.[4] Prior to that time the UIM benefits were diminished by the amount paid by the liability insurer for the tortfeasor. *See Coots v. Allstate Ins. Co.,* Ky., 853 S.W.2d 895 (1993). Because the accident giving rise to this litigation occurred on May 13, 1988, before the amendment, Motorists Mutual argues that any UIM benefit

recovery should be subject to offset. While we do not necessarily agree that the date of the accident is the triggering event, we are not bound to decide the question. We are of the opinion that the amendment of the statute is a non-issue. As we read Motorists' policies, they do not state with specificity that an offset should be effected, as was the situation in *LaFrange, supra.* To read into the policies the right of an offset requires a ratiocination that we are not inclined to afford. Without a "setoff" provision, as authorized by statute before amendment, we interpret the Glasses' policies as providing more coverage than required by the pre-amended version of KRS 304.39–320. At a minimum an insurance contract must include rights and obligations as required by statute; however, it is axiomatic that an insurance contract may "provide broader coverage than that required by statute." *LaFrange* at 413. We interpret the Glasses' policies as providing more UIM coverage, and thus the rights and liabilities so afforded are controlling.

In concluding this issue, there being only three insured vehicles in the Glass household at the time of the accident, Jeffrey was entitled to $150,000.00 UIM benefits, not the $200,000.00 awarded. Upon remand the court shall adjust the judgment accordingly.

We next turn to issues faced by Motorists regarding the application of various provisions of the Kentucky Unfair Claims Settlement Practices Act (UCSPA). KRS 304.12–230. Motorists claims entitlement to a directed verdict because of insufficient evidence regarding the claims of bad faith, violation of the UCSPA, and punitive damages.

Before addressing these issues we consider the question of whether a third party may pursue a bad faith claim under the UCSPA. Motorists contends

4. Ky.Rev.Stat. (KRS) 304.39–320 was originally enacted in 1974, with an effective date of July 1, 1975. Thereafter, it was amended,

effective July 15, 1988, and again, effective December 1, 1990.

that the UCSPA does not apply to third party claimants such as Jeffrey. We believe *State Farm Mut. Auto. Ins. Co. v. Reeder,* Ky., 763 S.W.2d 116 (1988), negates Motorists' argument and is controlling. We would be remiss, however, if we did not observe that the statute is not specifically designed to accommodate third party claims. This, of course, makes trial nearly impossible and appellate review most difficult.

As to sufficiency of evidence, a directed verdict is precluded "unless there is a complete absence of proof on a material issue in the action or if no disputed issue of fact exists upon which reasonable minds could differ." *Taylor v. Kennedy,* Ky.App., 700 S.W.2d 415, 416 (1985). Motorists Mutual denies any bad faith in its adjustment of Jeffrey's claim. Based upon the requirements for a bad faith claim under the UCSPA (*see Wittmer v. Jones,* Ky., 864 S.W.2d 885 (1993)), we conclude there was sufficient evidence supporting the issue's submissibility. Approximately a month and a half after the accident, Motorists' adjuster was authorized to pay the $50,000.00 policy liability limit; yet, Motorists did not tender same until years later and initially failed to advise Jeffrey of his potential UIM coverage. During the interim, astronomical medical bills emanating from the insured tort were mounting. Because reasonable minds could differ on the issue of Motorists' bad faith and because there was sufficient evidence to support the claim, we believe the circuit court properly submitted the matter to the jury.

Motorists also contends there was insufficient evidence supporting the jury's findings of a UCSPA violation and of Jeffrey's right to punitive damages.[5] For reasons similar to those given on the issue of bad faith, we conclude that the court did not err in submitting these issues to the jury.

**5.** As to any controversy existing over which standard should be applied in the determination of punitive damages under KRS 411.184

Concerning the issue of attorney fees, Motorists argues four specific points. First, it submits that KRS 304.12–235 does not apply to third party claimants. We disagree. Having already held that the UCSPA (KRS 304.12–230) applies to third party claimants, we perceive no logical basis for granting to such insured claimants the right to pursue a bad faith cause of action under KRS 304.12–230, but not under KRS 304.12–235. KRS 304.12–230 sets forth prohibited settlement practices of an insurer. KRS 304.12–235 stipulates the time allotted for payment of claims and the effect of failure to promulgate a settlement. Both statutes were enacted to protect the rights of an insured against unfair settlement practices. KRS 304.12–010. As such, they must be applied consistently to effectuate the purposes of both statutes. To do otherwise seems contrary to legislative intent.

Dispute also arises as to which version of KRS 304.12–235 is applicable. The controverted portion of the statute was amended July 13, 1990, and reads as follows:

> All claims arising under the terms of any contract of insurance shall be paid to the named insured person or health care provider not more than thirty (30) days from the date upon which notice and proof of claim, in the substance and form required by the terms of the policy, are furnished the insurer.

Although this version was applied by the circuit court, Motorists observes that at the time of the accident, the pre-amended statute—allowing for sixty days of payment on the claim—was in effect. In both versions the time period applies to subsections (2) and (3) regarding the time for settlement before interest or attorney fees can be awarded for failure to settle.

(applied by the circuit court) or *Wittmer v. Jones,* Ky., 864 S.W.2d 885 (1993), we are of the opinion that any difference is illusory.

We believe that Motorists' protracted delay in payment renders the dispute inconsequential as to the stipulation of thirty or sixty days. Thus, if any error existed in application of the statute, we perceive no resulting prejudice. CR 61.01

Motorists also objects to the jury instruction given to create liability under KRS 304.12–235(3). Specifically, Motorists contends the instruction excluded an element of the subsection and should have incorporated language that a delay in payment must be "without reasonable foundation." KRS 304.12–235(3). Motorists also maintains error on the basis that no evidence was presented on the reasonableness of the claimed fee. The circuit court rendered the following interrogatory to the jury:

> Do you believe from the evidence that the Defendant, Motorist Mutual Insurance Company, failed to make a good faith attempt to settle the Plaintiff's, Jeffrey A. Glass, claim within 30 days from the date on which notice or proof of loss in the substance and form required by the terms of the policy was furnished the Defendant, Motorist Mutual Insurance Company? [6]

The jury responded in the affirmative to this question, and Glass made a post-trial motion for one-third of attorney fees against Motorists and Farm Bureau. The motion was granted only against Motorists. The court then fixed the amount of attorney fees in an amount equal to one-third of the total recovery against Motorists. We believe both the instruction and the amount fixed by the court to be appropriate.

Finally, Motorists argues that the court erred in calculating interest on the award from the date of verdict rather than from date of judgment. We believe this indeed erroneous. KRS 360.040 provides for interest upon a judgment. We know of no authority for commencing interest from the date of verdict.

There may be special circumstances that would justify same, but they are not here present.

Motorists argues that the cumulative effect of various other errors deprived it of a fair trial. We have examined these alleged errors and find no merit.

In conclusion, we reverse and remand the judgment against Motorists as to the amount of UIM coverage and the award of interest prior to judgment; in all other respects, the judgment is affirmed.

### Farm Bureau's Appeal

Farm Bureau proffers an assortment of reasons why it should not be held liable as a violator of the UCSPA. Additionally, Farm Bureau contends that during the course of settlement negotiations, an oral agreement as to settlement was, in fact, reached and that this settlement should have been enforced. We shall discuss what we deem significant claims by Farm Bureau.

Farm Bureau first contends that the UCSPA is not a strict liability enactment and, therefore, for a claimant to prevail under the statute, he must prove intentional or outrageous conduct. While we are inclined to agree with this interpretation (see *Wittmer, supra*), we think there was sufficient evidence in the case *sub judice* to submit the matter to the jury. Farm Bureau maintains that it was in a peculiar position in that it was a third party insurer and had an obligation to its insured. Perforce, Farm Bureau argues in a roundabout manner that its actions could not be elevated to the level of violating the UCSPA. Here again we are unable to agree with Farm Bureau's contention and think the matter was one for jury determination.

Farm Bureau makes a strong argument that it should be shielded from liability because it had a right to rely upon the belief that an oral settlement of the claim asserted by Jeffrey had been

---

6. No similar instruction was given regarding Farm Bureau.

effected. The circuit court entered summary judgment denying the claim of settlement. Nevertheless, Farm Bureau contends that its reliance upon the settlement was reasonable and therefore precluded its violation of the UCSPA. We do not agree with this contention. We believe the circuit court was correct in summarily concluding that a binding settlement of this matter had not been effected. As to Farm Bureau's reliance upon same, we think it only a scrap of evidence to have been considered in its overall conduct in handling this claim. We cannot assign merit to Farm Bureau's contention that it should be excused from liability in its handling of the claim based upon the assumption of settlement. Moreover, we cannot ascribe credence to Farm Bureau's argument that the Glasses made no demand for settlement of the action and, thus, there is no condition for violation of the act.

Farm Bureau contends that the testimony of Clinton Miller, a claims settlement expert offered by the Glasses, was not competent to support a bad faith settlement practice. During the course of the trial, Farm Bureau sought to impeach Miller by offering into evidence derogatory information concerning his past. The court excluded the evidence which was proffered by avowal. The avowal evidence demonstrated that Miller was a three-time failure of the California bar and had been a plaintiff in several questionable lawsuits against insurance companies. Miller, however, was subjected to rigorous and skillful cross-examination revealing him to be a paid professional witness who frequently testified against the insurance industry. While we think the court might not have so severely limited cross-examination of Miller, we are unable to ascribe reversible error. CR 61.01. The jury was sufficiently advised of Miller's nature and purpose in his appearance as a paid professional witness, and we think it was able to appropriately weigh and evaluate his testimony. Upon the record as whole we conclude there was sufficient

basis to support the jury's determination that Farm Bureau violated provisions of the UCSPA.

Farm Bureau argues that damages in the form of emotional injuries were not justified in this case. We think this contention without merit. In view of the mounting medical expenses, failure to promptly settle this claim created a submissible issue as to whether there was outrageous conduct on the part of Farm Bureau within the context of *Wittmer, supra*. Farm Bureau contends that it was prejudiced by the court's allowing the evidence of Jeffrey's injuries, as if this were a tort claim against Jeffrey. This action, Farm Bureau contends, is in the nature of those allowed under KRS 446.070 for violation of a statute, namely, KRS 304.12–230. Additionally, Farm Bureau argues that the cumulative effect of evidentiary errors entitles it to a new trial. We ascribe no merit to these contentions.

Finally, Farm Bureau maintains that the court erred in including interest on the award from the date of verdict rather than from date of judgment. For the reasons herein stated in Motorists' appeal, we agree that the court indeed erred.

In conclusion we affirm all aspects of Farm Bureau's appeal, except the award of interest prior to judgment. The circuit court is reversed on this issue and, on remand, shall impose interest from the date of judgment.

### The Glasses' Cross–Appeal

We now address those issues raised in the Glasses' cross-appeal. Jeffrey contends that the jury should have been given an instruction on punitive damages against Farm Bureau. In *Wittmer, supra*, at 890, the Supreme Court set forth the following precept:

Before [a bad faith violation of the UCSPA] cause of action exists in the first place, there must be evidence

sufficient to warrant punitive damages.

The circuit court, in the case at hand, correctly concluded that sufficient evidence of bad faith was presented for the issue to be submissible, but failed to submit on punitive damages.

Interpreting the standard for punitive damages, the *Wittmer* Court states:

> This means there must be sufficient evidence of intentional misconduct or reckless disregard of the rights of an insured or a claimant to warrant submitting the right to award punitive damages to the jury. If there is such evidence, the jury should award consequential damages and may award punitive damages.

*Id.* at 890.

In light of *Wittmer* it may seem contrary for the circuit court to give an instruction on compensatory damages, yet preclude the jury from considering punitive damages. Nevertheless, we do not interpret *Wittmer* as mandating that a punitive damage instruction be given in all cases. Because Farm Bureau was an excess carrier and in view of the compensatory award against it, as well as the punitive damage award against Motorists, we are disinclined to reverse on this issue. We are of the opinion that the instructions rendered were sufficient to permit the jury to properly characterize the conduct of the respective carriers. Upon this line of reasoning, we also reject the Glasses' argument that an award of attorney fees should have been placed against Farm Bureau.

Finally, we reject the contention of Garnett Doyle and Brenda Glass as to their claim for a damage award. CR 8.01.

#### Summary

We affirm the judgment of the Shelby Circuit Court as it pertains to Motorists Mutual in every respect except as to the award of UIM benefits and the award of interest prior to judgment, which, upon remand, shall be adjusted in accordance with this opinion.

The judgment against Farm Bureau is affirmed in all respects with the exception of the interest award prior to judgment, which shall likewise be adjusted upon remand.

The cross-appeal is affirmed in all respects.

For the foregoing reasons, Appeal No. 93–CA–2137–MR and No. 93–CA–2235–MR are affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion. The cross-appeal, No. 93–CA–2198–MR, is affirmed.

For the reasons set forth hereinabove, I respectfully dissent.

STUMBO and WINTERSHEIMER, JJ., join this dissenting opinion.

LAMBERT, Chief Justice, Supplemental Dissenting.

Rehearing was granted herein on certain issues and the case was re-argued. Thereafter, the majority opinion was modified and this supplemental dissenting opinion is filed in response to modifications contained in the majority opinion. In all other respects, I reiterate the views expressed in my dissenting opinion filed herein on October 30, 1997.

In my view, the evidence presented at trial was decidedly conflicting on the issue of Joel Depp's informed, good faith evaluation of the Jeffrey Glass claim. After hearing all the evidence, the trial court believed the case should be submitted to the jury for its verdict on this issue, and the jury returned a verdict for Glass on the belief that Depp had violated the UCSPA, KRS 304.12–230, warranting compensatory damages. The Court of Appeals affirmed. Despite the foregoing and despite our duty to review the evidence in the light most favorable to the party who prevailed at trial (*Lewis v. Bledsoe Surface Mining Co.*, Ky., 798 S.W.2d 459, 461 (1990), and *NCAA v. Hornung*, Ky., 754

S.W.2d 855, 860 (1988)), this Court has reconsidered the evidence and concluded that neither the facts nor the law allow Glass to prevail. From this view, I dissent and will endeavor to demonstrate the error in the majority opinion.

The crucial factual question was whether Depp evaluated, properly or at all, the Glass claim, for purposes of settlement. Depp testified that he made such an evaluation but acknowledged that it was not recorded in the claim file. In deposition testimony and at trial, Depp also admitted that his claimed evaluation was based on woefully inadequate medical records and that vast sums of additional medical expenses had been incurred since his file had been updated. Moreover, there was no written analysis of comparative fault and after admitting that company policy required a written evaluation, Depp acknowledged his violation of such policy. Based on the testimony of Joel Depp, a jury could have reasonably believed, and indeed did believe, the theory that Depp, on behalf of Farm Bureau, had simply handed the claim over to Hackney, a structured settlement salesman, and had therefore abrogated his responsibility to evaluate the claim.

The UCSPA denounces as unfair claims settlement practices "Refusing to pay claims without conducting a reasonable investigation based upon all available information" and "Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear ." KRS 304.12–230(4), (6). Despite this language and the mandate of KRS 446.080 that statutes of this state be liberally construed to carry out the intent of the Legislature, the majority has held that the statute does not require an evaluation: "The UCSPA does not require that a claim be evaluated or that it be evaluated correctly." Slip op. 37. While it is true that the exact text of the statute does not use the term "evaluation," any reasonable construction of the statute would imply the necessity of an informal evaluation prior to any possible compliance with the literal statutory requirements.

In my view the revised analysis on page 38 of the majority opinion amounts to a concession that the facts were in dispute, but shifts the focus to the law and concludes that whether or not Depp failed to evaluate the claim, there could be no violation of the Act. Such a strict construction eviscerates the Act.

STUMBO and WINTERSHEIMER, JJ., join this supplemental dissenting opinion.