RENDERED: OCTOBER 20, 2016
TO BE PUBLISHED

**Supreme Court of Kentucky** FINAL

DATE 11/10/16 Kim Redmon, DC

2014-SC-000354-DG

PHILADELPHIA INDEMNITY INSURANCE                    APPELLANT
COMPANY, INC.


ON REVIEW FROM COURT OF APPEALS
V.                        CASE NO. 2013-CA-001275-MR
JEFFERSON CIRCUIT COURT NO. 12-CI-04231


RICHARD TRYON AND                                   APPELLEES
ENCOMPASS INDEMNITY COMPANY



AND                        2014-SC-000357-DG



ENCOMPASS INDEMNITY COMPANY                         APPELLANT

ON REVIEW FROM COURT OF APPEALS
V.                        CASE NO. 2013-CA-001275-MR
JEFFERSON CIRCUIT COURT NO. 12-CI-04231

RICHARD TRYON AND                                   APPELLEES
PHILADELPHIA INDEMNITY INSURANCE
COMPANY, INC.

**OPINION OF THE COURT BY CHIEF JUSTICE MINTON**

**AFFIRMING, IN PART, REVERSING, IN PART, AND REMANDING**

This case involves the construction of motor vehicle liability insurance policy provisions regarding Underinsured Motorist Insurance (UIM) coverage for a motor vehicle owned by the insured but not scheduled for coverage under the owner's policy. We granted discretionary review to determine whether such owned-but-not-scheduled provisions are enforceable as a matter of public policy to deny UIM benefits. We hold that they are, so long as the plain meaning of the policy clearly and unambiguously excludes this type of coverage.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Richard Tryon was driving his motorcycle when he was struck by an automobile driven by Logan Hopkins. Tryon insured his motorcycle with Nationwide Insurance Company of America, and the policy included underinsured motorist (UIM) coverage. At the time of the accident, he also owned two automobiles: a Lexus and an antique Pontiac Firebird. He insured Lexus with Encompass Indemnity Company and the Firebird with Philadelphia Indemnity Insurance Company, Inc. Both policies included UIM coverage provisions.

Tryon made UIM claims under all three policies. As the insurer of the motorcycle Tryon operated at the time of the accident, Nationwide's UIM coverage was undisputed. But both Encompass and Philadelphia denied UIM

coverage for Tryon. Specifically, they contend that their respective insurance policies have owned-but-not-scheduled-for-coverage exclusions—policy provisions that deny UIM coverage for operating or occupying other vehicles that Tryon owned but were not identified in the policy. Because Tryon did not include his motorcycle in either policy, both insurers insist they are not contractually obligated to provide him UIM benefits. Although similar in form, the policies have distinct textual differences.

The Encompass policy excluded UIM coverage when:

> While that covered person is operating or occupying a motor vehicle owned by, leased by, furnished to, or available for the regular use of a covered person if the motor vehicle is not specifically identified in this policy under which a claim is made.

This statement is augmented in Encompass's definition of a *covered person*. The policy specifically excludes from its definition insureds "while occupying, or when struck by, a vehicle owned by you which is not insured for this coverage under this policy."

Likewise, Philadelphia included a similar exclusion, although it is structurally different. The policy provides the following:

> A. We do not provide Uninsured Motorists Coverage for "bodily injury" sustained:
>     1. By an "insured" while "occupying," or when struck by, any motor vehicle owned by that "insured" which is not insured for this coverage under this policy. This includes a trailer of any type used with that vehicle.

Unlike the Encompass policy, the Philadelphia policy does not expressly differentiate between UIM coverage and uninsured motorist (UM) coverage.

3

Instead, the owned-but-not-scheduled exclusion mentions only the applicability of UM benefits with no reference whatsoever to UIM.

Tryon filed suit in circuit court. The trial court granted Encompass and Philadelphia summary judgment. Persuaded by the unpublished Court of Appeals opinion in *Motorists Mutual Insurance Co. v. Hartley*[1], the trial court ruled that the "language in the policies issued by Encompass and Philadelphia are (sic) unambiguous and clearly exclude coverage of Tryon's motorcycle."

The Court of Appeals reversed on appeal, noting that the trial court erred in relying on the unpublished *Hartley* opinion and that this Court's holding in *Chaffin v. Kentucky Farm Bureau Ins. Companies*[2] mandated coverage from Encompass and Philadelphia. Most notably, in *Chaffin*, we held that coverage is personal to the insured, an insured has a reasonable expectation of policy benefits when paying multiple premiums for the same type of coverage, and depriving an individual of such coverage is contrary to Kentucky's public policy.[3] According to the Court of Appeals, this controlling precedent required reversal of the trial court's summary judgment in favor of the insurers.

## I. ANALYSIS.

### A. Standard of Review.

On appellate review of the trial court's grant of summary judgment, we must determine whether the record, examined in its entirety, shows there is

---

[1] 2010-CA-000202-MR (Ky. App. Feb. 11, 2011) (discretionary review denied and opinion ordered unpublished (Ky. Feb. 15, 2012).

[2] 789 S.W.2d 754 (Ky. 1990).

[3] *Id.* at 756.

"no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."[4] All factual ambiguities are viewed in a light most favorable to the nonmoving party.[5] Because there are no factual disputes before us today and only review of questions of law, the lower courts' opinions are entitled to no deference and are reviewed de novo.

## B. UM Coverage, UIM Coverage, and Controlling Kentucky Law.

### 1. *Statutory authority.*

The Kentucky Motor Vehicle Reparations Act (MVRA) was enacted in 1974 to establish a comprehensive motor-vehicle insurance system designed to address the growing number of accidents on Kentucky roads each year.[6] Among the noteworthy aspects of the MVRA is the individual mandate for Kentucky drivers to purchase a baseline level of motor-vehicle liability insurance.[7] But the MVRA also addresses other forms of coverage incidental to the mandatory liability coverage, including direction to insurers on the role of underinsured motorist coverage (UIM).

The statute first defines an *underinsured motorist* as "a party with motor vehicle liability insurance coverage in an amount less than a judgment recovered against that party for damages on account of injury due to a motor vehicle accident."[8] Insurers are required to make UIM coverage "available *upon*

---

[4] Kentucky Rules of Civil Procedure (CR) 56.03.

[5] *See Hammons v. Hammons*, 327 S.W.3d 444, 448 (Ky. 2010).

[6] KRS 304.39-010.

[7] KRS 304.39-110.

[8] KRS 304.39-320(1).

*request* to its insureds," but "subject to the terms and conditions of such coverage not inconsistent with this section."[9] So the MVRA takes two strong positions on UIM coverage. First, UIM coverage is supplemental—insurers are not forced to offer it unless the insured requests this additional coverage. And second, insurers are free to contract with insureds on the form and scope of coverage, so long as the terms remain consistent with the remaining provisions of the MVRA.

Interestingly, the legislature's position on UM coverage is not found in the MVRA. Instead, the UM statute is found in a separate subsection as part of the legislative enactments concerning casualty insurance contracts. There, the term *uninsured motor vehicle* is robustly defined to include:

> An insured motor vehicle where the liability insurer is unable to make payment with respect to the legal liability of its insured within the limits specified therein because of insolvency; an insured motor vehicle with respect to which the amounts provided, under the bodily injury liability bond or insurance policy applicable at the time of the accident with respect to any person or organization legally responsible for the use of such motor vehicle, are less than the limits described in KRS 304.39-110; and an insured motor vehicle to the extent that the amounts provided in the liability coverage applicable at the time of the accident is denied by the insurer writing the same.[10]

With that definition firmly in place, the statute commands that all automobile and motor-vehicle insurance contracts must include UM coverage in limits consistent with the MVRA.[11] So while the MVRA makes UIM coverage optional,

---

[9] KRS 304.39-320(2).

[10] KRS 304.20-020(2).

[11] KRS 304.20-020(1).

6

supplemental insurance, the subsection relating to casualty-insurance contracts expressly forbids contracts that do not include UM benefits.

## 2. Jurisprudential distinctions.

As one of Tryon's primary arguments, he attempts to align his UIM policy limitation with provisions we condemned as contrary to Kentucky's public policy in *Chaffin v. Kentucky Farm Bureau Ins. Cos.*[12] Indeed, the Court of Appeals relied on this case as a critical source of its ruling that summary judgment in favor of Encompass and Philadelphia was improper. In *Chaffin*, a motorist was injured by an uninsured motorist. She maintained three separate policies with Kentucky Farm Bureau for UM coverage for three vehicles, paying separate premiums. Her policy actually included language excluding UM coverage for certain instances that was remarkably similar to Philadelphia's policy in the instant case. We first addressed in *Chaffin* whether this exclusion is an enforceable limitation or whether Chaffin was entitled to stack her policies and recover from all three. A divided Court held that stacking was permissible and that such anti-stacking exclusions were unenforceable.

Specifically, the majority held that "uninsured motorist coverage is personal to the insured; that an insured who pays separate premiums for multiple items of coverage has a reasonable expectation that such coverage will be afforded; and that it is contrary to public policy to deprive an insured of purchased coverage, particularly when the offer of such is mandated by

---

[12] 789 S.W.2d 754 (Ky. 1990).

statute."[13] The *Chaffin* Court's holding heavily depended on the doctrine of reasonable expectations as understood in this context to mean that "when one has bought and paid for an item of insurance coverage, he may reasonably expect it to be provided."[14] The Court determined that when insurers include anti-stacking limitations or exclusions of coverage for other vehicles owned but not insured, the promise of the insurance coverage as required under the law is "illusory."[15] So not only did *Chaffin* allow insureds to stack policies to recover UM benefits, it also held that other-vehicle exclusions of UM coverage are unenforceable as a matter of Kentucky public policy.

Although we recognize a number of factual similarities in Tryon's case, we also see key reasons why the *Chaffin* doctrine is ultimately irrelevant to today's issues. Most obviously, the type of coverage at issue is drastically different—*Chaffin* disputed UM recovery, while Tryon seeks recovery of UIM benefits. We see no reason to conflate UM and UIM when Kentucky statutory law does not do so. One is mandatory. The other is not. One is a facet of the MVRA, while the other is an aspect of enforceable casualty insurance contracts. It would seem these differences alone should be enough for us to determine that the outcome in *Chaffin* has no bearing on whether Tryon's provisions are enforceable as a matter of public policy.

---

[13] *Id.* at 756 (echoing a companion certification-of-law case rendered the same day, in *Hamilton v. Allstate Ins. Co.*, 789 S.W.2d 751 (Ky. 1990)).

[14] *Hamilton*, 789 S.W.2d at 753.

[15] *Chaffin*, 789 S.W.2d at 757-58.

We encountered this contrast in *Allstate Insurance Co. v. Dicke*[16], where this Court extended the *Chaffin* anti-stacking policy to UIM claims. Although the opinion largely retreads the familiar *Chaffin* position, statutory distinctions between UM and UIM coverage were presented as material distinctions. But the majority in *Dicke* dismissed these distinctions offhand as not "significantly meaningful to permit a different result."[17] The problem with our result in *Dicke*, of course, is that we failed explain *why* these distinctions are meaningless. Perhaps if we conducted a more searching statutory analysis, we would have discovered that the text stands squarely in opposition to our rule in *Dicke.*

The statutory language embodies legislative choices, a willful resolution of the General Assembly's declaration of Kentucky law. The words of the statute reflect a policy choice. As such, it follows that the use of particular words and the placement of certain provisions in certain areas of the statutory code are done so with care. It is accordingly the role of this Court to effectuate those terms and there meanings. Under this analysis, it is clear that UM and UIM coverage are separate facets of Kentucky insurance law.

If the legislature desired to make UIM coverage mandatory and thus subject to the identical public-policy considerations as UM coverage, it certainly could have. But instead, it elected to require such coverage "to be furnished only on request."[18] Additionally, all specific UM policy provisions

---

16 862 S.W.2d 327 (Ky. 1993).

17 *Id.* at 329.

18 *Id.* at 330 (Spain, J., dissenting).

mandatory under law must be approved by the Commissioner of Insurance.[19] In contrast, there is no such requirement for UIM policies; in fact, the UIM statute expressly states that insurers are free to set their own terms and conditions of coverage.[20] Despite the majority's holding in *Dicke*, we see a meaningful distinction between the two statutes. And given the unmistakably disparate treatment both in defining coverage and outlining acceptable procedures, "we are left with the inescapable fact that the parties were free to contract" UIM coverage.[21] And to the extent that *Dicke* is inconsistent with any of today's analysis, it is accordingly overruled.

But it is also important to note that *Chaffin* was ultimately not a decision reached through a methodical interpretation of various aspects of positive law. Nowhere in the majority opinion appears a single assertion that the holding of the case is a result of the meaning of a statutory command. Rather, the opinion essentially stands on purely common-law rationale almost in spite of the strictures in place detailing enforceable insurance policies within the state. Because *Chaffin* relied so heavily on common-law principles and also because there is significant statutory law regulating automobile insurance, that decision is most appropriately limited to the facts of that case. Simply put, there is a significant difference between UM and UIM coverage both in legislation and in our own insurance-law jurisprudence.

---

[19] *See* KRS 304.020(1) ("...under provisions approved by the commissioner...").

[20] *Dicke*, 862 S.W.2d at 330 (Spain, J., dissenting). *See also* KRS 304.39-320(2) ("...subject to the terms and conditions of such coverage not inconsistent with this section...").

[21] *Id.*

We have addressed the UIM statute in contexts not dissimilar from the one presented today. In fact, in *Motorists Mutual Ins. Co. v. Glass*[22], we distinguished UIM principles from our position with respect to UM benefits in *Chaffin* and its progeny. In that case, we held that a policy exclusion for any "vehicle owned by or furnished or available for the regular use of the insured or any family member" from its definition of an underinsured motorist is an enforceable provision.[23] This "regular-use exclusion" has been upheld by the Court of Appeals on at least three other occasions since *Glass*.[24]

We more recently readdressed the regular-use exclusion in *State Farm Mutual Ins. Co. v. Hodgkiss-Warrick*.[25] Although the case ultimately rested on Pennsylvania substantive law, our choice-of-law principles required us first to examine whether the policy provisions at issue could be supported as a matter of Kentucky public policy. And in light of *Glass*, we held that the regular-use exclusion did not run afoul of our public policy. We supported this ruling by stating, "a contract term is unenforceable on public policy grounds only if the policy asserted against it is clearly manifested by legislation or judicial decision and is sufficiently strong to override the very substantial policies in favor of the freedom of contract and the enforcement of private agreements."[26] Justice

---

[22] 996 S.W.2d 437 (Ky. 1997).

[23] *Id.* at 449-50.

[24] *See Burton v. Kentucky Farm Bureau Mut. Ins. Co.*, 326 S.W.3d 474 (Ky. App. 2010); *Edwards v. Carlisle*, 179 S.W.3d 257 (Ky. App. 2004); and *Murphy v. Kentucky Farm Bureau*, 116 S.W.3d 500 (Ky. App. 2002).

[25] 413 S.W.3d 875 (Ky. 2013).

[26] *Id.* at 880 (quoting Restatement (Second) of Contracts § 178 (1979)).

Hughes, writing for the Court, noted that there is no "specific provision of the MVRA...forbidding the sort of exclusion from underinsured motor vehicle coverage at issue here."[27] Summing up our stance on regular-use exceptions, "the gist of these cases is that it is not unreasonable or contrary to the MVRA to exclude UIM benefits in that situation, because otherwise household members would have an incentive to minimize their liability coverage in reliance on less expensive UIM coverage, and because otherwise the insurer is apt to be exposed to substantial risks it was not paid to underwrite."[28]

In the wake of *Glass* and *Hodgkiss-Warrick*, we have made clear that the MVRA does not outweigh the basic and fundamental liberty to contract and create personal insurance policies. Instead, rules of contract ultimately guide our analysis. And going full circle back to *Chaffin*, application of our contract principles ultimately becomes an inquiry of reasonable expectations. We held in *Simon v. Continental Insurance Co.*, that reasonable expectations with respect to insurance coverage essentially means that "the insured is entitled to all the coverage he may reasonably expect to be provided under the policy. Only an unequivocally conspicuous, plain and clear manifestation of the company's intent to exclude coverage will defeat that expectation."[29] So this doctrine is meant to be used "in conjunction with the principle that ambiguities should be

---

[27] *Id.* at 881.

[28] *Id.* at 882.

[29] 724 S.W.2d 210, 212-13 (Ky. 1986). *See also Bidwell v. Shelter Mut. Ins. Co.*, 367 S.W.3d 585, 588 (Ky. 2012) ("...[t]o be enforceable, Kentucky law requires a limitation of insurance coverage, such as a permissive user step-down provision, to be clearly stated in order to apprise the insured of such limitations.").

12

resolved against the drafter in order to circumvent the technical, legalistic, and complex contract terms which limit benefits to the insured."[30] But we are sufficiently satisfied that the terms in this policy are both reasonable and plainly accessible.

We noted in *Glass* that there is a true distinction between illusory coverage and instances where the policy simply does not apply to the facts of the case.[31] Indeed, this is perfectly in line with the text of the UIM portion of the MVRA—insurers may limit UIM coverage, at least within the confines of the rest of the statute. We think this strikes an adequate balance between the Commonwealth's interests in protecting drivers on its roadways with the insurance companies' desires to assess accurately the underwriting risks involved. Individuals are perfectly capable of negotiating UIM coverage, and it strains credulity to suggest it is too tall a task for insureds to read their policies.

The regular-use exclusion does not operate identically to the owned-but-not-scheduled provision in the present case, to be sure, but it nevertheless stands resolute as a bold statement from this Court that UIM coverage exclusions are not impermissible under Kentucky public policy and parties are at liberty to negotiate and customize policies to fit their own needs and desired levels of coverage. We shielded insurers under the regular-use exclusion from exposure to substantial risks they were not paid to underwrite. That rationale

---

[30] *Id.*

[31] *Glass*, 996 S.W.2d at 450.

13

is equally applicable to coverage in cases like Tryon's where the insured owns several other vehicles and chooses not to insure them under a particular policy or even with the same insurer. We see no reason to force insurers to bear the burden of an underwriting risk against the rest of the world while allowing the other contracting party to reap the benefits of multiple recoveries. There is no meaningful distinction between our rationale upholding regular-use and owned-but-not-scheduled exclusions, and the solution for both types of coverage is identical: "the named insured can avoid the fact of underinsurance by simply purchasing additional liability coverage for his vehicle."[32]

This opinion does not necessarily overrule *Chaffin* or its precedent with respect to UM coverage. But we do question whether the *Chaffin* Court's reasonable-expectation analysis truly synthesizes Kentucky contract principles or simply exists as a categorical rule to ensure that insureds always recover. But that issue is not before us today. For now, we can only state with certainty today that Kentucky public policy does not bar reasonable UIM exclusion provisions.

In summation, there is nothing either in the MVRA or our public policy prohibiting enforcement of exclusion of UIM coverage in certain scenarios. The reasonable expectations of coverage are satisfied so long as the plain meanings of the terms of the underlying policies are clear and unambiguous. We will now review the Encompass and Philadelphia policies, respectively, under that standard.

---

[32] *Id.* at 450.

14

## C. The Encompass Provision.

On review of Encompass's UIM exclusion for vehicles owned but not scheduled for coverage, we are persuaded that the policy is in fact a clear and unambiguous statement that the policy does not pay benefits for vehicles it does not insure. The Encompass policy creates a separate heading for UIM coverage. In its definition of a *covered person*, the policy expressly states that for the insured, his family members, and other occupants, UIM coverage will not be extended to vehicles owned by Tryon but not insured for coverage under this policy. In the provision defining *insured motor vehicle*, the policy goes on to contemplate the existence of additional automobiles, motorcycles, or motor homes. The policy contains a grace period of thirty days for newly acquired vehicles, where Encompass agrees to extend UIM coverage. But after that thirty-day period elapses, Tryon "must ask us [Encompass] to insure the automobile, motorcycle, or motor home, and we [Encompass] must agree." And finally, the Encompass policy includes a separate subsection for "Underinsured Motorists Losses We Do Not Cover." Detailed in that subsection, Encompass explicitly states that it does not provide UIM coverage for bodily injury for any covered person "operating or occupying a motor vehicle owned by, leased by, furnished to, or available for the regular use of a covered person if the motor vehicle is not specifically identified in this policy under which a claim is made."

There is no way we can say that, on plain reading of the policy provisions at issue, Tryon had any reasonable expectation of UIM coverage. The policy repeatedly instructs Tryon that Encompass has no intention of insuring any other vehicles Tryon may happen to own but chose not to insure under that

15

policy. This information is offered in plain language and presented boldly within the four corners of the agreement—this cannot be said to be hidden in the small print. All Tryon needs to do to understand his coverage is to simply read his policy. Encompass's policy is a clear and unambiguous manifestation of its intent to deny coverage in certain scenarios.

Because the terms are clear and because UIM exclusions like this are not unenforceable as a matter of law, we accordingly reverse the Court of Appeals' decision and reinstate the trial court's summary judgment in favor of Encompass.

### D. The Philadelphia Provision.

Unlike the Encompass policy, Philadelphia does not include a separate section marking the company's position on UIM coverage. Instead, it asks us to interpret the portion of the policy labeled "Uninsured Motorists Coverage" to include UIM. To be sure, the Philadelphia policy contains a familiar provision excluding coverage for bodily injury while "occupying, or when struck by, any motor vehicle owned by that insured which is not insured for this coverage under this policy." But this only expressly claims to exclude uninsured motorist coverage—the policy is silent with respect to underinsured motorist benefits.

We do not doubt that the text included in the policy is unambiguous—it seems quite clear that Philadelphia intends to exclude UM coverage for vehicles Tryon owned but did not insure under this policy.[33] But under the doctrine of

---

[33] This is actually a remarkably similar provision to the one we found unenforceable as a matter of public policy in *Chaffin.* Today's issue focuses solely on

16

reasonable expectations we updated above, there is no such clear statement with respect to UIM coverage. Assuming Tryon contracted for UIM coverage at all—an assertion that both parties at least implicitly concede—there is nothing in the policy reasonably to place him on notice that his UIM benefits are subject to certain situational exclusions.

We stated above that to defeat an insured's reasonable expectation of coverage, exclusions must be plainly and unequivocally presented in the four corners of the policy to satisfy the well-established rule of contract that ambiguous language must be construed against the drafter. It is evident that the excluded coverage in this policy is ambiguous at best, if not totally absent. Philadelphia is completely capable of drafting reasonable exclusions of UIM coverage under both the MVRA and our public policy, but if it chooses to do so, it must do so with certainty. Because this policy inadequately rebuts Tryon's reasonable expectation of coverage, we have no choice other than to affirm the Court of Appeals' decision reversing Philadelphia's summary judgment.

## II. CONCLUSION.

For the foregoing reasons, we hold that that owned-but-not-scheduled provisions for UIM coverage are enforceable under Kentucky law so long as they expressly and plainly apprise insureds of the exclusion. We reverse the Court of Appeals' decision and affirm summary judgment in favor of Encompass because the terms of its policy plainly excluded coverage. But

UIM coverage, so we need not address the applicability of *Chaffin* to Philadelphia's UM provision—that is a question for a different day.

17

because the Philadelphia policy failed to plainly exclude coverage in these circumstances, we affirm the Court of Appeals' reversal of summary judgment. Accordingly, the case is remanded to the trial court for proceedings consistent with this opinion.

All sitting. Minton, C.J.; Cunningham, Hughes and Keller, JJ., concur. Wright, J., concurs in part and dissents in part by separate opinion in which Noble and Venters, JJ., join.

WRIGHT, J., CONCURRING IN PART AND DISSENTING IN PART: While I concur with the majority insofar as it affirms the Court of Appeals' holding regarding the Philadelphia Indemnity Insurance policy, I respectfully dissent as to the Encompass Indemnity Company policy.

Ultimately, my view boils down to a simple premise: a reasonably prudent person purchasing insurance should not have to wrestle to divine the meaning of overly technical, vague, and legalistic terms; nor should he have to flip between unclear policy provisions to ascertain what his policy covers. Society benefits from contracts—from people fulfilling their promises. I would hold the exclusion unenforceable for two reasons. First, it would force insurance companies to find a way to clearly and unmistakably state what a plan covers and what it does not. Second, it would level the playing field so that a reasonably prudent purchaser of insurance would be capable of understanding the terms and provisions of a policy. This would go a long way in ensuring that consumers get what they bargain for.

The majority indicates that all Tryon had to do was to read his policy to know whether he was covered. I disagree. We cannot hold the average person to the same standard as we hold ourselves. We cannot forget that we have gone to school, practiced law (some of us in the very area of insurance law), sat on the benches of various courts in this Commonwealth and risen to the Supreme Court of Kentucky. We simply cannot expect the average person to have the same level of understanding we do when reading these contracts.

Even if the majority believes that an average person would understand this insurance policy, it is fatally easy to overestimate the average person's ability to understand legal concepts, language, and construction of contracts. It can be extremely difficult to set aside all of our background, education, and experience to determine what would be clear and easily understood by an average person. The typical consumer of insurance is unaccustomed to referencing various sections and subsections in order to ferret out the meaning of a term. Yet, the majority implies he should easily be able to do just that in order to know what is covered and what is not.

What is the reading level of the average adult? The Literacy Project Foundation's published statistics show that fifty percent of adults cannot read a book written at an eighth-grade level. (http://literacyprojectfoundation.org/community/statistics). According to the Clear Language Group "[t]he average reading level of American adults is about seventh to eighth grade level." (http://www.clearlanguagegroup.com/readability). The Clear Language Group goes on to clarify that even though readability scores are given as a "grade

19

level," that does not mean that an individual who has completed that grade level will understand the text. *Id.* There are many factors that affect understanding and the grade level is merely a determination if you are in the right "ballpark."

I used an online software tool (found at http://www.online-utility.org/english/readability_test_and_improve.jsp) to calculate readability by typing in the ninety-eight words that were the passages that the majority relied on in determining that Appellant was not covered under these circumstances. The actual document would have been much more difficult than the analysis showed, because of such factors as: the length of the entire document (one-hundred-thirteen pages); the fact that the document was written with many subsections; and the need to reference various sections in order to understand any particular phrase. The analysis determined that, according to the Gunning Fog Index, a person would need 13.96 years of formal education to understand the text on the first reading. The approximate representation of the U.S. grade level needed to comprehend the limited text that was analyzed was:

| | |
|---|---|
| Flesch Kincaid Grade level | 12.88 |
| ARI (Automated Readability Index) | 10.05 |
| SMOG | 15.00 |

This one-hundred-thirteen-page document would be much more difficult for the average American to read and understand than the majority believes.

This is further complicated by the way in which most insurance policies are sold. The person fills out an application and submits it to the insurance

20

company along with payment. The insurance company decides if it will insure the individual. If accepted, the individual is then mailed the insurance policy. (We do not know if these were the actual steps in this case because evidence was not taken on this issue.) The purchaser of the insurance is then left with the task of reading, understanding, and determining what his insurance coverage is and the dangers of all the exceptions. The purchaser then would have to determine whether to renegotiate any problem areas, purchase additional insurance, or begin searching for a new insurance policy. An average American could easily be overwhelmed with the task.

Furthermore, the majority deviates from nearly seventy years of precedent in this Court's construction of insurance policies. In 1950, our predecessor Court stated, "[a] policy or contract of insurance ordinarily is to be construed liberally in favor of the insured and strictly as against the insurer." *Koch v. Ocean Acc. & Guar. Corp.*, 313 Ky. 220, 224, 230 S.W.2d 893, 895 (1950). Likewise, for nearly a half century, this Court has held, "exceptions and exclusions [of insurance policies] should be strictly construed so as to make insurance effective." *State Auto. Mut. Ins. Co. v. Trautwein*, 414 S.W.2d 587, 589 (Ky. 1967). In fact, we have said, "as to the manner of construction of insurance policies, Kentucky law is crystal clear that exclusions are to be narrowly interpreted and all questions resolved in favor of the insured." *Eyler v. Nationwide Mut. Fire Ins. Co.*, 824 S.W.2d 855, 859 (Ky. 1992)(citing *Koch v. Ocean Accident & Guaranty Corp.*, 313 Ky. 220, 230 S.W.2d 893 (1950); *Webb v. Kentucky Farm Bureau Ins. Co.*, Ky. App., 577 S.W.2d 17 (1978)). While

21

these long-held tenets of our law are firmly established, I also agree that, "[t]he rule of strict construction against an insurance company certainly does not mean that every doubt must be resolved against it . . . [because] the policy must receive a reasonable interpretation consistent . . . [with] the plain meaning and/or language of the contract." *St. Paul Fire & Marine Ins. Co. v. Powell-Walton-Milward, Inc.*, 870 S.W.2d 223, 226 (Ky. 1994).

In *Bidwell v. Shelter Mut. Ins. Co.*, 367 S.W.3d 585, 588 (Ky. 2012), this Court unanimously held:

> [t]o be enforceable, Kentucky law requires a limitation of insurance coverage, such as a permissive user step-down provision, to be 'clearly stated in order to apprise the insured of such limitations.' *St. Paul Fire & Marine Ins. Co. v. Powell–Walton–Milward, Inc.*, 870 S.W.2d 223, 227 (Ky.1994). [N]ot only is the exclusion to be carefully, expressed, but . . . the *operative terms clearly defined.*
>
> *Id.*

(Emphasis added.) The majority's opinion alters this Court's precedent by holding that owned-but-not-scheduled exclusions of underinsured motorist insurance policies are enforceable as long as they "expressly apprise insureds of the exclusion," without the additional requirement that the operative terms be clearly defined. I believe the Court should not break with its precedent and should, instead, continue to require the policy to clearly define its operative terms.

22

In its exclusions, Encompass lists losses the company does not cover. Specifically, the policy states:

[w]e do not provide Underinsured Motorists Coverage for bodily injury sustained by any covered person . . . [w]hile that covered person is operating or occupying a motor vehicle owned by, leased by, furnished to, or available for the regular use of a covered person if the motor vehicle is not specifically identified in this policy under which a claim is made.

Encompass's policy also defines the operative term "covered person" as "[y]ou for the ownership, maintenance or use of any vehicle, except while occupying, or when struck by, a vehicle owned by you which is not insured for this coverage under this policy." We will examine these policy provisions in turn.

First, the policy fails to define a phrase used in its exclusions. It is unclear what constitutes a "motor vehicle . . . not specifically identified in this policy under which a claim is made." This term could potentially mean motor vehicles *covered* under the policy. However, that is not the only possible meaning. "Identified" could also mean a vehicle "excluded by endorsement," as contemplated elsewhere in the policy—as that vehicle would be "identified" by policy documents.

Just like the exclusion provision in *Bidwell,* Encompass's policy exclusion, "leaves the policyholder guessing as to this provision's meaning."

23

*Bidwell,* 367 S.W.3d at 590-91. "And since the policy is drafted in all details by the insurance company, it must be held strictly accountable for the language used. *Wolford v. Wolford,* 662 S.W.2d 835 (Ky. 1984)." *Eyler,* 824 S.W.2d at 859-60. Thus, "when ambiguities exist, we resolve them against the drafter 'in order to circumvent the technical, legalistic and complex contractual terms which limit benefits to the insured.' *Simon v. Cont'l Ins. Co.,* 724 S.W.2d 210, 213 (Ky. 1986) (quoting R.H. Long, *The Law of Liability Insurance,* § 5.10B)." *Bidwell,* 367 S.W.3d at 588-89.

The majority holds that owned-but-not-scheduled exclusionary provisions are enforceable "so long as they expressly apprise insureds of the exclusion." And the majority concludes that the Encompass exclusion meets that standard. I disagree. In order for the apprisal to be express, the provision must be "[c]learly and unmistakably communicated; [or] stated with directness and clarity." EXPRESS, Black's Law Dictionary (10th ed. 2014). Encompass failed to unmistakably communicate the parameters of the exclusion. As this Court unanimously said:

> "An essential tool in deciding whether an insurance policy is
> ambiguous, and consequently should be interpreted in favor of the
> insured, is the so-called 'doctrine of reasonable expectations.'"
> [*Simon v. Continental Ins. Co.,* 724 S.W.2d 210, 212 (Ky. 1986).]
> We explained in *Simon* that "[t]he gist of the doctrine is that the
> insured is entitled to all the coverage he may reasonably expect to
> be provided under the policy. Only an unequivocally conspicuous,

24

plain and clear manifestation of the company's intent to exclude coverage will defeat that expectation." *Id.* (internal citation and quotation marks omitted).

*Bidwell,* 367 S.W.3d at 589 (Ky. 2012).

Furthermore, the majority uses the policy's definition of "covered person" to support its claim that "the policy is in fact a clear and unambiguous statement that the policy does not pay benefits for vehicles it does not insure." However, this is a misstatement of the material terms of the policy.

The definition of covered person reads "[y]ou for the ownership, maintenance or use *of any vehicle* . . . ."[34] (Emphasis added.) Thus, contrary to the majority's contention, the policy covers virtually any vehicle used by the insured. The sole exception under the definition of "covered person" is for those vehicles owned by the insured but not covered under this policy.[35] Therefore, had Tryon been riding his friend's motorcycle when he experienced an underinsured loss (assuming that motorcycle was not available for his regular use, pursuant to the policy's exclusionary provisions), Encompass

---

[34] The syntax of the phrase "you for the ownership, maintenance or use" frankly puzzles me and further supports my contention that the language throughout the policy relating to underinsured motorists coverage is, indeed, ambiguous.

[35] If one applies the language from the underinsured motorists exclusion instead of the definition of covered person, the corpus of what the policy excludes potentially changes. Instead of whether the vehicle is covered under this policy, the determinative factor is whether a vehicle owned by the insured is specifically identified in the policy—further evidence of the plan's ambiguity relating to underinsured motorists coverage.

25

would pay underinsured motorists benefits to him, irrespective of the liability insurance carrier for his friend's motorcycle. As this hypothetical illustrates, it is clear that the policy does, in fact, pay benefits for vehicles it does not insure. Therefore, the majority's statement that "the policy is in fact a clear and unambiguous statement that the policy does not pay benefits for vehicles it does not insure," is simply incorrect.

Finally, I point out that the policy does not use the language "except . . . a vehicle owned by you which is not insured under this policy" when describing the "Underinsured Motorists Losses We Do Not Cover," but rather, only when defining "covered person." That begs the question: which is it? Does the exclusion mean any vehicle owned by the insured but not covered by Encompass? Or, does the exclusion apply to motor vehicles not "identified" under this policy? This key difference between policy terms creates further ambiguity. Whether the ambiguity arises from structural issues or whether it is a result of inconsistent or confusing language, courts should interpret the ambiguous terms in favor of the insured and in favor of insurance coverage—just as courts of this Commonwealth have done for more than a half century.

It is for these reasons that I dissent and would affirm the Court of Appeals.

Noble and Venters, JJ., join.

26

COUNSEL FOR:

PHILADELPHIA INDEMNITY INSURANCE
COMPANY, INC.:
Robert E. Stopher
Robert Dmitri Bobrow
Boehl, Stopher & Graves, LLP.

ENCOMPASS INDEMNITY COMPANY:
William Baxter Orberson
Patricia Colleen Le Meur
James Crockett Wade
Phillips Parker Oberson & Arnett, PLC.

COUNSEL FOR RICHARD TRYON:

A. Thomas Johnson

COUNSEL FOR AMICUS CURIAE: KENTUCKY DEFENSE COUNSEL, INC.:

Eric Allen Hamilton
Coleman Lockmiller & Bond

COUNSEL FOR AMICUS CURIAE: KENTUCKY JUSTICE ASSOCIATION:

Kevin Crosby Burke
Burke Neal PLLC.